# FOR PUBLICATION



**FILED**

Aug 06 2013, 5:36 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**GUY A. RELFORD**
The Law Offices of Guy A. Relford
Carmel, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELLEN H. MEILAENDER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

ROBERT E. REDINGTON,                )
                                    )
    Appellant-Respondent,           )
                                    )
        vs.                       )    No. 53A01-1210-CR-461
                                    )
STATE OF INDIANA,                   )
                                    )
    Appellee-Petitioner.            )

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Mary Ellen Diekhoff, Judge
Cause No. 53C05-1208-MC-1375

**August 6, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Robert E. Redington appeals from the trial court's order to retain firearms. Redington raises four issues, which we consolidate and restate as:

I.      Whether Ind. Code § 35-47-14-1 *et seq.*, as applied to Redington, is unconstitutional; and

II.     Whether the evidence is sufficient to support the order that Redington's firearms be retained.

We affirm.

FACTS AND PROCEDURAL HISTORY[1]

In late July 2012, Redington, who lives in Indianapolis, approached Devon Moore, a Bloomington parking enforcement officer in a Bloomington parking garage and began telling him that he has a gun range and that he found a person dead behind the range and thought perhaps he had killed the man, but that he subsequently learned that the man had killed himself. As Moore attempted to walk away, Redington followed him and began speaking about Lauren Spierer, an Indiana University student who had disappeared, and stated that he was in Bloomington to help find her, explaining that he had met her previously and that "he thought that she would come back and he would see her either through spirit or her physical body." Transcript at 9. He also said that he believed Spierer would "come around" to Kilroy's Sports Bar, which was where she had been the night she went missing, and that "he was just waiting for her to be there." Id. at 13. Redington also stated that "he sees spirits and dark entities" and spoke about Jewish neighbors of his who "molested one of their daughters and [Redington] found out about it and they took him [] up north somewhere and [] let him off in a cornfield," and about

_____

[1] We held oral argument on June 18, 2013, in Indianapolis. We commend counsel for their effective advocacy.

2

how he "and his dad could see dark spirits in his home . . . ." Id. at 9. Redington also told Moore that "he had guns on him and it made [him] feel . . . courageous to have" them. Id. at 11. Moore phoned his boss after ending the encounter with Redington, and his boss told him that if he observed Redington again he should call the police.

About a week later, on August 4, 2012, Moore again observed Redington on the third floor of the same parking garage appearing to be looking through binoculars toward Kilroy's, and Moore called the police. Bloomington Police Officer Kyle Abram and another officer responded and observed Redington in the northwest corner of the third floor overlooking Kilroy's holding a range finder and, with guns drawn, made contact with him. Redington put his hands up and told the officers that he had a gun, and Officer McCoy, the second officer, recovered a handgun from Redington's pocket. Officer McCoy unloaded the gun, which had a bullet in the chamber and a full magazine, and then handed the weapon to Officer William Keaton, who had arrived on the scene. Officer Abram then observed a second gun sticking out from Redington's right front pocket, and Officer McCoy retrieved that gun as well, unloaded it, and handed it to Officer Keaton. Redington informed the officers that he had a shotgun in his vehicle which the officers eventually retrieved, as well as various rounds of ammunition located throughout the car.

The officers asked Redington why he was there, and he responded that he had been coming to Bloomington from Indianapolis for several weekends in a row and that he was "looking at or for people and at buildings and at lights." Id. at 31. Redington then said that he had previously met Spierer at a gun range and "he got her name wrong and . .

3

. he felt and told her that he felt that she was in danger of some type and that he warned her of that . . . ." Id. Redington also told the officers that he checked the range of the front door of Kilroy's with his range finder and asked the officers if they "felt with the firearms that [they] carry on duty . . . in a firefight that we would be able to hit someone from sixty-six yards during and in the mist [sic] of a firefight." Id. at 32. Soon after, Redington mentioned that "he had ranged what would be approximately sixty-six yards from where he . . . was standing . . . [on] the third floor of the parking garage to . . . where you would come around the corner" the officers used to approach. Id. Redington also stated that he ranged to somewhere near the back of Kilroy's as being approximately sixty-six yards. Officer Abram asked Redington at some point if he owned other guns, and Redington laughed and said that he had several and specifically noted that he owned a rifle that "he had sighted in at that distance of sixty-six yards" and that "he could shoot accurately at that distance." Id. at 33-34. Redington's statements "alarmed [Officer Abram] quite a bit." Id. at 34.

Officer Abram asked Redington if he would come to the police station to speak about the Spierer case, and Redington agreed and drove himself to the station. Bloomington Police phoned Detective Randy Gehlhausen, who had been working on the Spierer investigation, to come in and interview Redington. At the outset of the interview, Detective Gehlhausen asked Redington why he was in Bloomington and Redington replied: "I am in searching of anything I can come up with. Anything. I get kinda weird here, so and I don't, I don't allow myself to be limited to the physical. If I get a funny feeling, that's good enough." Exhibit A at 4-5. Redington then stated that he was

4

looking for Spierer, telling Detective Gehlhausen that he had met Spierer at a gun range three years ago with Cory Rossman, who was a person of interest in the investigation, and that Redington had warned her that she was in danger. Detective Gehlhausen knew that this was not true because Spierer and Rossman were not acquainted at that time. Redington told Detective Gehlhausen that he had been looking for Spierer and wanted to avenge her. He spoke about observing a petite woman on the college campus and how "[i]t would take nothing to just grab her and toss her in" a vehicle, and how he went to a strip club and paid a stripper one dollar for every question he asked her, including how much she weighed, how tall she is, and how much she can drink in an evening. Id. at 24. Redington told Detective Gehlhausen that, based upon her responses, in which she said she was four feet, six inches tall and weighed ninety-two pounds, he thought: "Could she put up a fight? Could she do anything? Could she run? What could she do?" Id. at 25.

Redington also stated that he had dreams about death and told stories including that his father told him that he would see him again after he passed, which came true, that he recalled an incident "about seeing an owl and a black man involved in the Spierer investigation by an ash tree close to Kilroy's," and that once, while attending a church in North Carolina, he envisioned that the pastor's son was committing suicide which turned out to be the case. Transcript at 67-68. He told Detective Gehlhausen that he possessed "[i]nsight" and has a "[s]piritual gift of prophecy." Exhibit A at 44. Detective Gehlhausen's impression of Redington based upon the interview was that he appeared "very delusional," noting also that Redington "would just jump from one conversation to the next" and that he would talk to himself when he was alone and would talk under his

5

breath to himself when in the presence of others. Transcript at 69. Redington also told Detective Gehlhausen that he did not point a rifle at anybody "because there's too many cameras and that he would have been seen." Id. at 70. Detective Ric Crussen, who was the main investigator of Spierer's disappearance, also interviewed Redington and confronted him about not being truthful which made Redington angry.

Following the interview, Officer Abram transported Redington to the IU Health Center in Bloomington for a mental evaluation. Dawn Goodman, the registered nurse assigned to Redington, observed that he "appeared delusional, grandiose, and [] religiously preoccupied," in that he appeared to be experiencing "a break with . . . reality" and that he claimed "he would know things that would happen beforehand." Id. at 97-98. In addition to talking about the Spierer investigation, Redington told Goodman that he had an ongoing problem with neighbors running through his home, although his wife had not witnessed this, that he did not feel safe at home, that he saw ghosts, and that he hears a small voice in his head. Redington also met with and was treated by Doctor Carey Mayer, a licensed psychiatrist.

That same night, Officer Abram obtained search warrants to retain the three firearms seized from Redington in the parking garage and to search his home in Indianapolis to retrieve other firearms. Detective Gehlhausen and Sergeant Brad Seperts, along with a member of the Indianapolis Metropolitan Police Department, executed the search warrant of Redington's home and discovered guns throughout the home. The majority of the guns were recovered from Redington's bedroom, including ten or twelve on the bed and underneath the sheets or tucked underneath the pillows, a few in between

the bed and the frame, and another twelve guns underneath the bed. Also in the bedroom were several rifle cases, baskets containing handguns, and drawers containing handguns. The bedroom also contained enough ammunition to probably "fill up the back of a pickup truck." Id. at 74. All told, the police seized forty-eight firearms, including several rifles equipped with scopes, as well as handguns and shotguns.

On August 13, 2012, the State filed a petition for a hearing pursuant to Ind. Code § 35-47-14-5, and the court set a hearing date of August 20, 2012. Following a continuance which was requested by Redington, the court held a hearing on September 5, 2012, in which evidence consistent with the foregoing was presented. At the hearing, Dr. Mayer testified that his impression was that Redington suffered from "a type of personality disorder called schizotypal" which "is a consolation of a [sic] personality characteristics and traits," specifically has "a flavor of schizophrenia," and is "characterized by someone who tends to be a loner, tends to have magical or odd type of thoughts" and "to be paranoid and suspicious of the intentions of others." Id. at 111. Dr. Mayer testified that this diagnosis was also informed based upon talking with Redington's wife and a therapist who examined him. Dr. Mayer testified specifically that Redington's wife indicated that Redington keeps to himself, is alienated from his family, "had had difficulties being able to go to churches," and has been asked on more than one occasion to leave a church "because of the behaviors that he was demonstrating." Id. at 112. Redington's wife also noted that he had been asked to leave Kilroy's on more than one occasion.

7

Dr. Mayer indicated that in addition to the schizotypal diagnosis, he could not yet rule out the possibility that Redington had a delusional disorder or a paranoid disorder. Dr. Mayer testified that Redington's wife stated that, since they had been married, he experienced visual hallucinations having to do with children in the neighborhood coming in and out of his home. Redington also told Dr. Mayer that he would receive information from spirits and would have premonitions. Dr. Mayer testified that he prescribed an anti-psychotic medication called Zyprexa to treat Redington, that he recommended out-patient treatment, and that he was not aware if Redington was taking his medication or seeing a mental health professional. On cross-examination, Dr. Mayer testified that he measured Redington's global assessment function, or GAF, at between fifty and sixty, which placed "him into mild to moderate degree of psychiatric difficulties or stress." Id. at 122.

On September 19, 2012, the court issued its Order to Retain Firearms Pursuant to I.C. 35-47-14 which stated that the State proved by clear and convincing evidence that Redington was dangerous as defined by Ind. Code § 35-47-14-1 and ordered that the Bloomington Police Department retain all fifty-one of the firearms seized from him. The court also ordered that Redington's license to carry a handgun be suspended pursuant to Ind. Code § 35-47-14-6(b).

ISSUES

I.

The first issue is whether Ind. Code § 35-47-14-1 *et seq.* (the "Act"), as applied to Redington, is unconstitutional. At the outset, we address an argument by the State that Redington has waived his constitutional challenges because he is raising them for the first

8

time on appeal. We acknowledge that this court and the Indiana Supreme Court "have previously held on several occasions that failure to file a proper motion to dismiss raising a constitutional challenge to a criminal statute waives the issue on appeal." Allen v. State, 798 N.E.2d 490, 502 (Ind. Ct. App. 2003) (citing Smith v. State, 727 N.E.2d 763, 766 (Ind. Ct. App. 2000); Payne v. State, 484 N.E.2d 16, 18 (Ind. 1985); Wiggins v. State, 727 N.E.2d 1, 5 (Ind. Ct. App. 2000), trans. denied; Vaillancourt v. State, 695 N.E.2d 606, 610 (Ind. Ct. App. 1998), trans. denied; Reed v. State, 720 N.E.2d 431, 433 (Ind. Ct. App. 1999), trans. denied). However, both courts have also considered constitutional challenges even when the defendant has failed to file such a motion. See Burke v. State, 943 N.E.2d 870, 872 (Ind. Ct. App. 2011) (citing Morse v. State, 593 N.E.2d 194, 197 (Ind. 1992) (stating that "the constitutionality of a statute may be raised at any stage of the proceeding including raising the issue *sua sponte* by this Court" and therefore addressing a constitutional challenge to a statute raised for the first time in defendant's *pro se* motion filed on appeal even though defendant's counsel did not raise the issue in an appellate brief), reh'g denied; Payne, 484 N.E.2d at 18 (acknowledging doctrine of waiver but considering unpreserved constitutional challenge where State did not raise waiver issue); Price v. State, 911 N.E.2d 716, 719 (Ind. Ct. App. 2009) (addressing a constitutional challenge to a criminal statute even though defendant failed to file motion to dismiss and State argued waiver), trans. denied; Vaughn v. State, 782 N.E.2d 417, 420 (Ind. Ct. App. 2003), trans. denied), trans. denied; see also Plank v. Cmty. Hosps. of Ind., Inc., 981 N.E.2d 49, 53-54 (Ind. 2013) ("Essentially, Morse stands for the proposition that appellate courts are not prohibited from considering the

9

constitutionality of a statute even though the issue otherwise has been waived. And indeed a reviewing court may exercise its discretion to review a constitutional claim on its own accord.").

Here, we choose to address Redington's constitutional challenges on the merits. In so doing, we note that the Act is dissimilar to most statutes codified under Title 35 in that Redington was not charged with a crime by indictment or information; thus, the relevant statutory provisions for filing a motion to dismiss an indictment or information, upon which our case law relies for finding waiver of constitutional issues on criminal issues, are inapplicable. See Payne, 484 N.E.2d at 18; Ind. Code §§ 35-34-1-4, -6. Also, we note that under the Act, specifically Ind. Code § 35-47-14-8, Redington may file a petition to have his firearms returned to him 180 days following the entry of the order to retain firearms; thus, there is an element of judicial economy in addressing his claims at this time. Further, this case appears to be an issue of first impression, and, as recent events nationwide have demonstrated, poses a question of great public interest.

The constitutionality of statutes is reviewed *de novo*. Conley v. State, 972 N.E.2d 864, 877 (Ind. 2012), reh'g denied. "Such review is 'highly restrained' and 'very deferential,' beginning 'with [a] presumption of constitutional validity, and therefore the party challenging the statute labors under a heavy burden to show that the statute is unconstitutional.'" Id. (quoting State v. Moss-Dwyer, 686 N.E.2d 109, 111-112 (Ind. 1997)).

Ind. Code § 35-47-14-1, or Section 1 of the Act, provides a definition of the term "dangerous" as follows:

10

(a)     For the purposes of this chapter, an individual is "dangerous" if:

     (1)     the individual presents an imminent risk of personal injury to the individual or to another individual; or

     (2)     the individual may present a risk of personal injury to the individual or to another individual in the future and the individual:

          (A)     has a mental illness (as defined in IC 12-7-2-130) that may be controlled by medication, and has not demonstrated a pattern of voluntarily and consistently taking the individual's medication while not under supervision; or

          (B)     is the subject of documented evidence that would give rise to a reasonable belief that the individual has a propensity for violent or emotionally unstable conduct.

(b)     The fact that an individual has been released from a mental health facility or has a mental illness that is currently controlled by medication does not establish that the individual is dangerous for the purposes of this chapter.

Section 2 provides that a court may issue a warrant to search for and seize firearms in the possession of an individual who is dangerous pursuant to certain procedures, and Section 3 provides a mechanism for a law enforcement officer to seize firearms from an individual believed to be dangerous without a warrant. See Ind. Code §§ 35-47-14-2, -3. Also, Section 5 provides:

(a)     Not later than fourteen (14) days after a return is filed under section 4 of this chapter or a written statement is submitted under section 3 of this chapter, the court shall conduct a hearing to determine whether the seized firearm should be:

     (1)     returned to the individual from whom the firearm was seized; or

11

> > (2) retained by the law enforcement agency having custody of the firearm.
>
> (b) The court shall set the hearing date as soon as possible after the return is filed under section 4 of this chapter. The court shall inform:
>
> > (1) the prosecuting attorney; and
> >
> > (2) the individual from whom the firearm was seized;
>
> of the date, time, and location of the hearing. The court may conduct the hearing at a facility or other suitable place not likely to have a harmful effect upon the individual's health or well-being.

Ind. Code § 35-47-14-5. Section 6 provides that, at the hearing, the State must prove that the individual is dangerous by clear and convincing evidence and that if the court so finds, it may order law enforcement to retain the firearms and shall suspend the individual's license to carry a handgun, if applicable.[2] Ind. Code § 35-47-14-6.

Redington raises three constitutional arguments as: (A) that the Act, as applied, violates Article 1, Section 32 of the Indiana Constitution; (B) that the Act, as applied, violates Article 1, Section 21 of the Indiana Constitution and the Fifth Amendment of the United States Constitution; and (C) that Ind. Code § 35-47-14-1(a)(2) is void for vagueness. We address each of Redington's arguments separately.

A. Article 1, Section 32

---

[2] In addition, Section 4 provides that the law enforcement officer, following service of the warrant, shall file a return with the court stating that the warrant was served and setting forth the time and date, the name and address of the individual named, and the quantity and identity of any firearms seized. Ind. Code § 35-47-14-4. Section 7 provides that if certain firearms are owned by another individual other than the individual determined to be dangerous, the court may order the law enforcement agency to return the firearm to the owner. Ind. Code § 35-47-14-7. Section 8 provides that at least 180 days following the order to retain firearms, the individual may petition the court for the return of said firearms and that the court shall set a date for a hearing, and Section 9 provides that, if at least five years have passed since the first hearing, the court may, following a hearing in which notice was provided, order that the law enforcement agency destroy or permanently dispose of the firearms. Ind. Code §§ 35-47-14-8, -9.

Article 1, Section 32 of the Indiana Constitution provides: "The people shall have a right to bear arms, for the defense of themselves and the State." However, the Indiana Constitution also "affirmatively recognizes the state's police power." Lacy v. State, 903 N.E.2d 486, 489 (Ind. Ct. App. 2009) (quoting City Chapel Evangelical Free Inc. v. City of South Bend ex rel. Dep't of Redevelopment, 744 N.E.2d 443, 446 (Ind. 2001)), trans. denied. "It declares that government is 'instituted for [the People's] peace, safety, and well-being.'" Id. (quoting City Chapel, 744 N.E.2d at 446 (quoting IND. CONST. art. 1, § 1)). In this case, the governmental police power of regulating arms challenges the limitations on government when addressing the right to bear arms.

The Indiana Supreme Court has explained:

[I]n Indiana the police power is limited by the existence of certain preserves of human endeavor, typically denominated as interests not "within the realm of the police power," upon which the State must tread lightly, if at all. Put another way, there is within each provision of our Bill of Rights a cluster of essential values which the legislature may qualify but not alienate. A right is impermissibly alienated when the State materially burdens one of the core values which it embodies.

Price v. State, 622 N.E.2d 954, 960 (Ind. 1993) (internal citations and footnote omitted), reh'g denied.

Redington argues that, although facially valid, as applied to him Ind. Code § 35-47-14-1(a)(2) "is clearly not a rational or valid exercise of police power." Appellant's Brief at 21. He argues that he has never been convicted of a crime, he does not have a "mental illness" as described in the Act, and he dutifully takes his prescribed medication. Redington asserts that there is no evidence in the record that he presents a risk to anyone, and the court concluded that he was "dangerous" based upon "a hypothetical 'concern'

13

about [his] potential conduct in the future." Id. at 21-22. He contends that "the Act implicates a core value embodied in the Indiana Constitution," and accordingly "the only remaining question is whether the Act places a 'material burden' on that core value." Id. at 22. He further argues that although the right to bear arms is not absolute, "as applied to Redington[] the Act clearly places a material burden on his right to bear arms in self-defense," and he states that "[n]ot only has the Act created a 'material burden' on his constitutionally protected 'right to bear arms'- that right has been entirely eviscerated as to firearms." Id. at 23.

The State maintains that the Indiana Constitution "affirmatively recognizes the state's police power" and, through its police power, "the State may place reasonable restrictions on the possession of firearms without thereby violating Section 32." Appellee's Brief at 21. The State argues that "[t]here can be no serious dispute that [the Act] is rationally related to the State's interest in protecting the safety and welfare of the public and therefore constitutes a valid exercise of the police power." Id. at 22. The State contends that, to the extent Redington challenges subsection (a)(2), which deals with persons who may present a risk of physical injury to that person or another individual in the future, such a restriction "is just as rationally related to the protection of the community's safety and welfare as is restricting firearm possession where the danger is imminent" because such "danger can be likely to come to fruition even if it is not deemed 'imminent,' and it will often be too late to prevent injury from occurring if the State cannot act . . . until the person is pointing the gun at someone." Id. at 23.

14

The State further argues that the Act "does not materially burden the core value of self-defense that lies at the heart of Section 32" because the Act does "not completely prohibit the individual from possessing any and all types of arms that could be used to defend themselves; they impact only the possession of firearms" and that, in any event, the Act does not necessarily deprive the individual permanently of his firearms. Id. at 24. Ind. Code § 35-47-14-8 provides that the individual may petition for the return of the firearms after 180 days and every subsequent 180 days thereafter. The State also asserts that, "more importantly, however, the right to bear arms must be balanced against the equally important right to life recognized by Article 1, Section[ ]1, and the fundamental interest of Hoosiers in public order, safety, and well-being" and that "[t]here is no material burden if the expression of the right at issue 'threatens to inflict 'particularized harm' analogous to tortious injury on readily identifiable private interests.'" Id. at 24-25 (quoting State v. Econ. Freedom Fund, 959 N.E.2d 794, 805 (Ind. 2011) (quoting Whittington v. State, 669 N.E.2d 1363, 1370 (Ind. 1996)), reh'g denied, cert. denied, 133 S. Ct. 218 (2012)). The State argues that this court has already determined that the legislature's decision to permanently prohibit the possession of firearms by a serious violent felon does not run afoul of Article 1, Section 32,[3] and that "[a]lthough the basis

---

[3] Ind. Code § 35-47-4-5, in subsections (a) and (b), define the terms "serious violent felon" and "serious violent felony," respectively, and in subsection (c), provides: "A serious violent felon who knowingly or intentionally possesses a firearm commits unlawful possession of a firearm by a serious violent felon, a Class B felony." As noted by the State, this court has held:

> The dispositive question is whether the serious violent felon statute's deprivation of the liberty and property interest protected by Article I, Section 32 of the Indiana Constitution is without rational basis. We again conclude that "[t]he legislative decision to prevent serious violent felons from possessing potentially deadly weapons cannot be said to be without rational basis" and, thus, Conrad's substantive due process challenge fails.

for considering the person to be dangerous is different, the same reasoning applies to individuals who fall within Indiana Code Section 35-47-14-1(a)(2) . . . ." Id. at 25-26.

Initially, we note that to the extent Redington argues that the Act is not a valid exercise of the state's police power, his arguments are essentially a challenge to the sufficiency of the evidence presented to show that he is "dangerous" as defined by Ind. Code § 35-47-14-1 which we address in Part II, *infra*. Moreover, we observe that the Indiana Supreme Court has instructed that "[t]he State may exercise its police power to promote the health, safety, comfort, morals, and welfare of the public." Price, 622 N.E.2d at 959. Although "the propriety of an exercise of the police power is a judicial question," we "accord considerable deference to the judgment of the legislature" because "the decision as to what constitutes a public purpose is first and foremost a legislative one," and on review, "[w]e [limit] ourselves to the narrow role of determining whether challenged state action has some reasonable relation to or tendency to promote the state's legitimate interests." Whittington, 669 N.E.2d at 1369 (footnotes omitted). Thus, questions of whether a statute constitutes a valid exercise of police power are typically reviewed under the rational basis review standard, which requires that the legislation bear a rational relation to a legitimate governmental purpose. See Price, 622 N.E.2d at 959; Hawkins v. State, 973 N.E.2d 619, 622 (Ind. Ct. App. 2012).

Here, we note that the United States Supreme Court has recently and repeatedly recognized the legitimate governmental purpose of prohibiting the mentally ill from possessing firearms. See McDonald v. City of Chicago, Ill., 130 S. Ct. 3020, 3047

Conrad v. State, 747 N.E.2d 575, 585 (Ind. Ct. App. 2001), trans. denied, superseded by statute on other grounds as recognized by Mills v. State, 868 N.E.2d 446 (Ind. 2007).

16

(2010); District of Columbia v. Heller, 554 U.S. 570, 626-627, 128 S. Ct. 2783, 2816-2817 (2008). The purpose of the Act is to provide a mechanism for the State to seize and retain firearms from persons it deems "dangerous," which as Section 1 describes above, are persons who, due to mental instability, present risk of personal injury to themselves or others, be it imminent or in the future. Accordingly, and giving deference to the legislative decision, we conclude that the Act is rationally calculated to advance this legitimate governmental interest.

Next, we address whether the Act materially burdens a core value. This court has previously recognized "the core value embodied by Section 32 is the right for law-abiding citizens to bear arms for self defense." Lacy, 903 N.E.2d at 490; see also Kellogg v. City of Gary, 562 N.E.2d 685, 694 (Ind. 1990) (noting that the "right of Indiana citizens to bear arms for their own self-defense and for the defense of the state is an interest in both liberty and property," and "[t]his interest is one of liberty to the extent that it enables law-abiding citizens to be free from the threat and danger of violent crime"). Thus, we must decide whether the Act implicates this core value and, if so, whether the Act materially burdens this core value. In this regard, we hold that even assuming that the Act implicates this core value, the core value is not materially burdened by it.

In Lacy, we observed that "[m]aterial burden analysis involves no . . . weighing nor is it influenced by the social utility of the state action at issue." 903 N.E.2d at 490 (quoting Price, 622 N.E.2d at 960 n.7) (internal quotations omitted). "Instead, we look only at the magnitude of the impairment. If the right, as impaired, would no longer serve

17

the purpose for which it was designed, it has been materially impaired." Id. (quoting Price, 622 N.E.2d at 960 n.7). "[A] state regulation creates a material burden if it imposes a substantial obstacle on a core constitutional value serving the purpose for which it was designed; and . . . in most circumstances, less than a substantial obstacle does not." Id. (quoting Clinic for Women, Inc. v. Brizzi, 837 N.E.2d 973, 984 (Ind. 2005)).

However, "Indiana courts have already held that the right to bear arms is not absolute." Id. (citing Kellogg, 562 N.E.2d at 694). "The Indiana Supreme Court has determined that the 'Legislature has the power, in the interest of public safety and welfare, to provide reasonable regulations for the use of firearms . . . .'" Id. at 490-491 (quoting Matthews v. State, 237 Ind. 677, 686, 148 N.E.2d 334, 338 (1958) (rejecting an Article 1, Section 32 challenge to handgun legislation)). Also, as the Indiana Supreme Court recently observed, "state action does not impose a material burden on expression if either the 'magnitude of the impairment' is slight or the expression threatens to inflict 'particularized harm' analogous to tortious injury on readily identifiable private interests." Econ. Freedom Fund, 959 N.E.2d at 805 (quoting Whittington, 669 N.E.2d at 1370) (emphasis added); see also Price, 622 N.E.2d at 964 ("[T]reating as abuse political speech which does not harm any particular individual ('public nuisance') does amount to a material burden, but holding that sanctioning expression which inflicts upon determinable parties harm of a gravity analogous to that required under tort law does not.").

18

"Thus, determining whether a statute imposes a material burden . . . may involve two components: 'magnitude of the impairment' analysis and 'particularized harm' analysis." Econ. Freedom Fund, 959 N.E.2d at 806. In Econ. Freedom Fund, the Indiana Supreme Court discussed the test in examining Ind. Code § 24-5-14-5(b), part of Indiana's "Autodialer Law," imposed a material burden on the defendant's free speech rights under Article 1, Section 9 of the Indiana Constitution:

> Under "magnitude of the impairment" analysis, we look at whether there has been a substantial obstacle on the right to engage in political speech. The important inquiry is whether the right to engage in political speech, as affected, no longer serves the purpose for which it was designed. If a substantial obstacle does not exist, there is no material burden on the right to engage in political speech. But if a substantial obstacle does exist, we also engage in "particularized harm" analysis: we look at whether the speaker's actions are analogous to conduct that would sustain tort liability against the speaker. If there is a "particularized harm," then we conclude that the state action does not impose a material burden on the right to engage in political speech. Conversely, a lack of "particularized harm" means there is a material burden. Ultimately, a material burden on political speech exists only in the presence of a substantial obstacle on the right and the absence of particularized harm caused by the speaker.

Id.

Here, Redington essentially argues that the Act poses a material burden because his right to bear arms under Article 1, Section 32 "has been entirely eviscerated as to firearms." Appellant's Brief at 23. We disagree and find that the Act, as applied to Redington, passes muster on both components of the material burden analysis.

First, regarding the "magnitude of the impairment," our task is to examine whether there exists a substantial obstacle on Redington's right to bear arms for self-defense. Although currently Redington is proscribed from owning any firearms, we note that the Act provides a mechanism whereby Redington may regain both his right to carry a

19

handgun as well as recover his seized firearms. As noted above, Section 8 of the Act provides that Redington may petition for the return of the firearms 180 days following the court's order, and he may again petition the court every subsequent 180 days thereafter. Upon the filing of each petition, the court shall set a hearing date and hold a hearing, and Redington will be given an opportunity to prove by a preponderance of the evidence that he is not dangerous, and, if successful, the court shall order that his firearms be returned. Ind. Code § 35-47-14-8(b), -8(d)(2), -8(e). We also note that the Act does not preclude Redington from possessing other weapons he may own for self-defense.

Even were we to deem the magnitude of the impairment as substantial, however, we find that Redington's challenge fails on the second component; that is, we find that Redington continuing to own firearms threatens to inflict "particularized harm" analogous to tortious injury on readily identifiable private interests.[4] Indeed, the Act seeks to keep firearms from individuals it deems "dangerous" if and when they present a risk of personal injury to either themselves or other individuals. On that score, we also observe that, as discussed below, the State bears the burden of proving that the individual is "dangerous" by a heightened clear and convincing evidence standard. Ind. Code § 35-47-14-6(a). We therefore conclude that the Act does not place a material burden upon the core value of Redington's right to defend himself and accordingly that the Act is not unconstitutional as applied to Redington.

B.      Article 1, Section 21 and the Fifth Amendment

---

[4] We note that for our purposes here, we need only find that a *threat* analogous to tortious injury on readily available private interests exists regarding the "particularized harm" component. We address the sufficiency of the State's evidence it presented against Redington to determine whether Redington is "dangerous" under the Act in Part II, *infra*.

20

Article 1, Section 21 of the Indiana Constitution provides: "No person's particular services shall be demanded, without just compensation. No person's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered." Also, the relevant clause of the Fifth Amendment to the U.S. Constitution provides that "private property" shall not "be taken for public use, without just compensation." "Insofar as the Takings Clauses are concerned, the federal and state constitutions are textually indistinguishable" and "the courts have treated these issues as identical." Cheatham v. Pohle, 789 N.E.2d 467, 473 (Ind. 2003); see also State v. Kimco of Evansville, Inc., 902 N.E.2d 206, 210 (Ind. 2009) (noting that Article 1, Section 21 of the Indiana Constitution "and the federal takings clause are textually indistinguishable and are to be analyzed identically"), reh'g denied, cert. denied, 130 S. Ct. 1136 (2010).

Redington argues that "[t]here can be no rational dispute that the seizure and retention of [his] firearms constitutes a 'taking.'" Appellant's Brief at 26. He asserts that it is "clear that Indiana courts will consider a takings case that involves personal property" and cites to Farley v. Hammond Sanitary Dist., 956 N.E.2d 76 (Ind. Ct. App. 2011), reh'g denied, trans. denied, for this proposition, noting that in that case this court "considered a takings case on the merits that involved damage to 'personal property' in a homeowner's basement after the defendant's alleged negligence allowed sewage to enter the basement and damage the property." Appellant's Brief at 27. He contends that the State, without any compensation to Redington, has deprived him "of all or substantially all economic or productive use of his [] property." Id. at 27-28 (quoting Green River

Motel Mgmt. of Dale, LLC, 957 N.E.2d 640, 644 (Ind. Ct. App. 2011) (quoting Kimco, 902 N.E.2d at 210-211), reh'g denied, trans. denied). Redington also argues that because he has never been arrested or convicted of any crime and his property has not been used in a crime, this case is distinguishable from a forfeiture case.

The State's position is that Redington's "argument rests on a fundamental misunderstanding of the operation of this provision" because "Section 21 is an eminent domain provision that operates when private property is taken for public purposes" and "does not serve as a restraint on the properly exercised police power of the State." Appellee's Brief at 26. The State also maintains that "[w]hen the State is acting in its police power to protect the lives and health of its citizens, it can 'destroy private property without rendering compensation.'" Id. at 27 (quoting Cincinnati, I. & W. Ry. Co. v. City of Connersville, 170 Ind. 316, 322, 83 N.E. 503, 506 (1908), affirmed by 218 U.S. 336, 31 S. Ct. 93 (1910)). The State further argues that the Indiana Supreme Court has specifically "held that section 21 of article 1 of the Constitution of Indiana applies only to the taking of private property under the power of eminent domain and, consequently, does not restrain the General Assembly in its exercise of the police power of the state." Id. (quoting Buckler v. Hilt, 209 Ind. 541, 546, 200 N.E. 219, 221 (1936)).

We need not examine whether seizing and retaining Redington's firearms constituted a taking under Article 1, Section 21 of the Indiana Constitution and the Fifth Amendment, however, because, as discussed in Part I.A, it was a valid exercise of the state's police power for the public welfare. As the Indiana Supreme Court, in State ex rel. Mavity v. Tyndall, 225 Ind. 360, 74 N.E.2d 914 (1947), superseded by statute on

22

other grounds as recognized by Kleiman v. State, 590 N.E.2d 660, 661 (Ind. Ct. App. 1992), reh'g denied, recognized, where a citizen's property rights and right to privacy as guaranteed by the constitution are at issue and the takings clause is implicated, "these rights must be made to harmonize with the rights of the people collectively to life, liberty, safety and the pursuit of happiness likewise guaranteed by the constitution" and that "[b]etween these rights there is sometimes an apparent conflict." 225 Ind. at 365, 74 N.E.2d at 916. The Court, although recognizing that "[i]t is a duty of government in so far as possible to avoid this conflict and to provide a way of life and safety that will protect both rights" and that "it is possible that each may have to yield to some extent," noted that the legislature:

> has a duty to enact laws providing for the general welfare and safety of the people within the state, and such laws, if reasonable, *will not be in conflict with guaranteed rights of the individual*. Property or property rights may not be taken or destroyed under the guise of the police power or of a police regulation, *unless the taking or destruction has a just relation to the protection of the public health, welfare, morals or safety*. Unless it affirmatively appears by the act, or the history of its enactment that it has no such just relation, *the police power extends even to the taking and destruction of property*. It will be presumed that the act is reasonable, unless the contrary appears from facts of which the courts will take notice.

Id. at 365, 74 N.E.2d at 916-917 (emphases added).

Indeed, as noted above by the State, the Indiana Supreme Court has specifically held that where the state is acting pursuant to a valid exercise of its police power for the public welfare, it may "destroy private property without rendering compensation." Cincinnati, 170 Ind. at 322, 83 N.E. at 506. The Court observed that the takings clause and police power are "two distinct principles" and that: "The rule is well settled that neither a natural person or corporation can claim damages on account of being compelled

23

to comply with a police regulation, designed to secure the public health, safety, or welfare" and that "[i]t is equally well settled that an uncompensated obedience to a regulation ordained to secure the public health and safety is not a taking of private property, within the inhibitions of the state or federal Constitution."  Id. at 321, 324, 74 N.E. at 506-507.  See also Ule v. State, 208 Ind. 255, 264, 194 N.E. 140, 143 (1935) (holding that Article 1, Section 21 of the Indiana Constitution "was not intended to serve as a restraint upon the exercise of the police powers of the state, and the circumstance that for a time a law may inflict hardship, inconvenience, and possibly loss to an individual does not amount to a constitutional objection so long as such burdens or losses are not needlessly and unreasonably imposed, but result as an incident of a general enactment fairly designed to subserve the public welfare"); City of Indianapolis v. Indianapolis Water Co., 185 Ind. 277, 299-300, 113 N.E. 369, 375 (1916) ("There can be no doubt that uncompensated obedience to a regulation, enacted for the public safety under a proper exercise of the police power, does not constitute a taking of property without due compensation, and the constitutional prohibition against the taking of private property without compensation is not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of all governments."); Stone v. Fritts, 169 Ind. 361, 366 82 N.E. 792, 794 (1907) ("The enforcement of regulations enacted in the proper exercise of the police power of the state cannot be resisted as a taking of private property without compensation in violation of section 21, art. 1, of the state Constitution."); State v. Richcreek, 167 Ind.

24

217, 223-224, 77 N.E. 1085, 1087 (1906) (holding that "it is only the taking of specific pieces of private property by the exercise of the power of eminent domain, without compensation, that [] is prohibited by §21, article 1, of the state Constitution" and that "this constitutional provision was not intended to serve as a restraint upon the exercise of the police power of the state for the public welfare, by which a particular use of property once lawful and unobjectionable, may be forbidden, or property be wholly destroyed, without compensation and without the fault of the owner"); cf. $100 v. State, 822 N.E.2d 1001, 1013-1014 (Ind. Ct. App. 2005) (noting that the United States Supreme Court has held that forfeiture statutes causing "the forfeiture of an innocent owner's property did not amount to an unconstitutional taking without compensation") (citing Bennis v. Michigan, 516 U.S. 442, 452, 116 S. Ct. 994 (1996) (holding the forfeiture of a car based on a violation of nuisance laws was not a taking of private property for public use in violation of the Takings Clause of the Fifth Amendment because "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain"), reh'g denied, 517 U.S. 1163, 116 S. Ct. 1560 (1996)), trans. denied.

Thus, the Act, as applied to Redington, does not infringe upon Redington's constitutional rights found in Article 1, Section 21 of the Indiana Constitution and the Fifth Amendment, and accordingly, we conclude Redington is not entitled to just compensation for the firearms retained by the Bloomington Police Department.

25

C.    <u>Vagueness</u>

A statute will not be found unconstitutionally vague if individuals of ordinary intelligence would comprehend it adequately to inform them of the proscribed conduct. <u>State v. Lombardo</u>, 738 N.E.2d 653, 656 (Ind. 2000) (citing <u>State v. Downey</u>, 476 N.E.2d 121, 122 (Ind. 1985), <u>reh'g</u> <u>denied</u>).  The statute "need only inform the individual of the generally proscribed conduct, [and] need not list with itemized exactitude each item of conduct prohibited." <u>Id.</u> (quoting <u>Downey</u>, 476 N.E.2d at 122).  Further, criminal statutes may be void for vagueness "for the possibility that it authorizes or encourages arbitrary or discriminatory enforcement." <u>Gaines v. State</u>, 973 N.E.2d 1239, 1243 (Ind. Ct. App. 2012) (citing <u>Brown v. State</u>, 868 N.E.2d 464, 467 (Ind. 2007)).  Finally, "it is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand." <u>Lombardo</u>, 738 N.E.2d at 656 (quoting <u>Davis v. State</u>, 476 N.E.2d 127, 130 (Ind. Ct. App. 1985) (quoting <u>United States v. Mazurie</u>, 419 U.S. 544, 550, 95 S. Ct. 710 (1975)), <u>reh'g</u> <u>denied</u>, <u>trans. denied</u>).

As to this issue, Redington argues that an element of Ind. Code § 35-47-14-1(a)(2) is that a person is considered "dangerous" if that person "may present a risk of personal injury to the individual or to another individual in the future" which "allows a person to be deprived of his constitutionally-protected right to keep and bear arms[] based exclusively upon speculation and conjecture."[5]  Appellant's Brief at 28-29.  Redington argues that "Indiana courts have long held that expert testimony 'must be based on more

---

[5] Redington argues that because "there is absolutely no evidence in this record to establish that [he] is currently 'dangerous' as defined by I.C. §35-47-14-1(a)(1). . . . [T]he trial court must have relied upon I.C. §35-47-14-1(a)(2) in finding that he is 'dangerous.'" Appellant's Brief at 31.

26

than subjective belief or unsupported speculation'" and that, accordingly, "it is arguable that this provision of the Act actually establishes its definition of 'dangerous' on a factual predicate that should not even be admissible in evidence." Id. at 29. In support of his argument, Redington cites to a case from the Indiana Supreme Court which examined a statute using the phrase "may endanger" and construed the statute so as to exclude the "may" dimension, and he argues that "[t]here is absolutely no operative difference between . . . the term 'that may endanger life or health in the former I.C. §35-46-1-4(a)(1) and the use of the term 'may present a risk of personal injury to the individual or to another individual in the future' in I.C. §35-47-14-1(a)(2)," and that if anything, "the Act is more vague because [it] adds the term 'in the future' . . . ." Id. at 29-31 (discussing Downey, 476 N.E.2d at 123).

The State initially argues that Redington challenges only subsection (a)(2) as void for vagueness, and thus because the order can be sustained under subsection (a)(1), we need not address this vagueness challenge. The State asserts that Redington's challenge fails on the merits as well, noting that "[i]t is not difficult to understand what 'present a risk of personal injury' to another means . . . especially [] when it is read in context as the contrast to the 'imminent risk of personal injury' language in subsection (a)(1)." Appellee's Brief at 31. The State contends that "the existence of that risk must be established by clear and convincing evidence, so it is not just a speculative endeavor." Id. The State further argues that, if Redington's argument that no one can reasonably predict future conduct is to be accepted, then "subsection (a)(1) would also be impermissibly vague, since it also requires drawing a conclusion about what the person is

27

likely to do in the future, albeit the immediate future, yet [Redington] does not" challenge subsection (a)(1) as to vagueness. Id. The State also contends that "the legislature has further qualified those individuals who are captured within the statute" in subparagraphs (a)(2)(A) and (a)(2)(B), and "[t]hese limitations give greater definition to the dangerousness that the legislature is trying to address . . . ." Id. at 31-32. Finally, the State argues that Downey is distinguishable because in that case, "[t]he statute drew no lines to differentiate between trivial and significant risks," but the legislature in writing Ind. Code § 35-47-14-1(a)(2) narrowed the scope of the statute when it included subparagraphs (a)(2)(A) and (a)(2)(B), specifying that "[t]he risk of injury must be coupled with an untreated mental illness . . . or established violent or unstable propensities." Id. at 32.

In Downey, the Indiana Supreme Court addressed whether the neglect of a dependent statute in place at the time was unconstitutionally vague. The pertinent part of the statute, Ind. Code § 35-46-1-4(a)(1), provided at the time that "(a) A person having the care, custody or control of a dependent who knowingly or intentionally: (1) Places the dependent in a situation that may endanger his life or health; . . . Commits neglect of a dependent, a class D Felony." 476 N.E.2d at 122. The Court, while noting that "the words 'may endanger' as being the particular source of vagueness," observed that "there must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so that erratic arrests and convictions for trivial acts and omissions will not occur. It cannot be left to juries, judges, and prosecutors to draw such lines." Id. at 123 (citing Stone v. State, 220 Ind. 165, 41 N.E.2d 609 (1942)). The Court

28

noted that, under the language of the applicable version of Ind. Code § 35-46-1-4(a)(1), "it would be a crime to raise a child in a high-rise apartment or to mop the kitchen floor with a bucket of water in the presence of a small child," and it specifically held:

> We agree that the statute construed literally has a broadness and vagueness which would prevent it from meeting constitutional muster. This defect stems in major part from the double contingency factored into the definition of the crime by the phrase "may endanger." With that phrase intact persons of common intelligence are left to guess about the statute's meaning and would differ as to its application.

Id.

Here, by contrast, the Legislature did not leave it to juries, judges, and prosecutors to engage in line drawing and specified the circumstances in which a court may find an individual to be dangerous in the future. Specifically, the Legislature qualified subsection (a)(2) by providing that, in order to find that an individual may be dangerous in the future, the State must prove by clear and convincing evidence not only that the individual may present a risk of personal injury to the individual or another individual in the future, but also it must demonstrate that the individual either:

> (A)    has a mental illness (as defined in IC 12-7-2-130) that may be controlled by medication, and has not demonstrated a pattern of voluntarily and consistently taking the individual's medication while not under supervision; or

> (B)    is the subject of documented evidence that would give rise to a reasonable belief that the individual has a propensity for violent or emotionally unstable conduct.

Ind. Code § 35-47-14-1(a)(2). Thus, Ind. Code § 35-47-14-1(a)(2) does not suffer from the same defect as was the case in Downey. Accordingly, and after consideration of the

29

facts at hand which we review more thoroughly below in Part II, we conclude that Ind. Code § 35-47-14-1(a)(2) is not void for vagueness.

## II.

The next issue is whether the evidence is sufficient to order that Redington's firearms be retained. The Act specifies that at the hearing, the State was required to prove all material facts by clear and convincing evidence. Ind. Code § 35-47-14-6(a). As is the case in other sufficiency matters, on review we consider only the evidence favorable to the judgment and all reasonable inferences. Heald v. Blank, 785 N.E.2d 605, 613 (Ind. Ct. App. 2003), trans. denied. We will not reweigh the evidence or judge the credibility of witnesses. Golub v. Giles, 814 N.E.2d 1034, 1038 (Ind. Ct. App. 2004), trans. denied. If the court's order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. Id.

As noted above, the Act instructs that a court may, following a hearing, order law enforcement to retain seized firearms if the State proves by clear and convincing evidence that the individual who owns the firearms is "dangerous." Again, Ind. Code § 35-47-14-1 defines the term "dangerous" for purposes of the act and provides that an individual is "dangerous" if "the individual presents an imminent risk of personal injury to the individual or to another individual" under subsection (1) or, alternatively, under subsection (2), "the individual may present a risk of personal injury to the individual or to another individual in the future" and the individual either: "(A) has a mental illness (as

defined in IC 12-7-2-130)[6] that may be controlled by medication, and has not demonstrated a pattern of voluntarily and consistently taking the individual's medication while not under supervision;" or "(B) is the subject of documented evidence that would give rise to a reasonable belief that the individual has a propensity for violent or emotionally unstable conduct." Also, subsection (b) provides that "[t]he fact that an individual has been released from a mental health facility or has a mental illness that is currently controlled by medication does not establish that the individual is dangerous for the purposes of this chapter." Thus, in order to sustain an order for the Bloomington Police Department to retain Redington's firearms, the State was required to prove that Redington presented an imminent risk of personal injury to himself or to another individual, or, alternatively, that Redington may present a risk of personal injury to himself or to another individual in the future and that he either has a mental illness and

---

[6] Ind. Code § 12-7-2-130 provides:

"Mental illness" means the following:

(1) For purposes of IC 12-23-5, IC 12-24, and IC 12-26, a psychiatric disorder that:

(A) substantially disturbs an individual's thinking, feeling, or behavior; and

(B) impairs the individual's ability to function.

The term includes mental retardation, alcoholism, and addiction to narcotics or dangerous drugs.

(2) For purposes of IC 12-28-4 and IC 12-28-5, a psychiatric disorder that:

(A) substantially disturbs an individual's thinking, feeling, or behavior; and

(B) impairs the individual's ability to function.

The term does not include developmental disability.

31

has not been taking medication voluntarily or consistently to control such illness, or is the subject of documented evidence giving rise to a reasonable belief that he has a propensity for violent or emotionally unstable conduct.

Redington argues that the record is "entirely devoid of any evidence that [he] is currently 'dangerous,' as defined by I.C. 35-47-14(a)(1)." Appellant's Brief at 15. He notes that Dr. Mayer indicated that he believed Redington was not a threat to himself or others when he was released from Bloomington Hospital. He also argues that the State failed to provide clear and convincing evidence satisfying either prong of Ind. Code § 35-47-14-1(a)(2), which details the method by which the State may establish that a person is dangerous based upon the risk of personal injury to himself or others in the future as a basis for retaining firearms. Redington's position regarding the first prong is that the State was required to prove that he has a mental illness controllable by medication and that he has not demonstrated a pattern of voluntarily and consistently taking such medication, and "[t]he only evidence on this point came from Redington himself, who testified that he has regularly taken his prescribed medication since it was prescribed." Id. at 17.

Redington turns next to Ind. Code § 35-47-14-1(a)(2)(B), which provides that the State may prove that an individual is dangerous if that person may present a risk of personal injury to the individual or to another in the future if that person "is the subject of documented evidence that would give rise to a reasonable belief that the individual has a propensity for violent or emotionally unstable conduct." He contends that Dr. Mayer "only testified to a hypothetical 'concern'" and that although "the State had every

opportunity to ask Mr. Mayer if he saw any indication of" such conduct, the State "chose not to ask that question, and instead asked only a question which usurped the trial court's determination of the ultimate legal issue before it" when it asked Dr. Mayer whether he believed Redington should have access to firearms and Dr. Mayer responded that he did not think it was a "good idea." Id. Redington argues that Dr. Mayer's testimony to that effect "could have been based on any number of undisclosed factors, including Dr. Mayer's personal opinions on firearms" and that "[b]y failing to elicit any testimony that Dr. Mayer's 'concerns' were based on Redington's 'violent or emotionally unstable conduct,' the State clearly failed to establish by 'clear and convincing evidence' that Redington is 'dangerous' as defined" by Ind. Code § 35-47-14-1(a)(2)(B). Id. at 18.

The State first argues that it sustained its burden under subsection (a)(1), that Redington presents an imminent risk of personal injury to himself or others, noting that although Dr. Mayer testified that, in his professional opinion, Redington did not present an imminent risk to anyone on August 5, 2012 when he was discharged from the hospital, "the court was not obligated to agree with that opinion given the other evidence presented." Appellee's Brief at 13 (citing Fernbach v. State, 954 N.E.2d 1080, 1084-1085 (Ind. Ct. App. 2011), trans. denied). The State points out that Redington was found on the third floor of a parking garage using a range finder to range distances to various locations around Kilroy's, that he was armed with two loaded handguns in his pockets as well as a loaded shotgun and extra ammunition in his vehicle, and that he made alarming comments to the responding officers. The State maintains that Redington suffers from a schizotypal personality disorder, is paranoid and delusional, specifically noting that

33

Redington told police officers and hospital employees that he "feels the 'negative energy' of death all around him, believes bizarre 'dreams' or premonitions that he has (often involving dead people) come true or really happened, and is obsessed with the Spierer disappearance." Id. at 14. The State argues that Redington "appears unhealthily obsessed with firearms, going so far as to sleep with them in his bed" and notes that the police "found approximately twelve guns under the sheets and tucked around the pillows in [his] bed, in addition to numerous other guns found under and around the bed," and the State further notes that Redington admitted to attempting to purchase new firearms during the pendency of the proceedings below. Id. at 15. The State contends that the fact Redington presents an imminent threat is "especially true because it was apparent at the hearing that [his] delusional thought patterns continue despite the anti-psychotic medication he was prescribed." Id.

The State also argues that it satisfied subsection (a)(2) of the statute, that Redington may present a risk of physical injury to himself or others in the future, noting at the outset that Dr. Mayer testified that Redington has a mental illness, specifically schizotypal personality disorder, and he testified that Redington may also have a delusional disorder or a paranoid disorder. The State argues that although mental illness alone is insufficient to prove dangerousness under the statute, "the nature of that mental illness and the ways in which it manifests itself in a person's behavior are still highly relevant to assessing the risk of harm posed by the person, as is the extent to which medication or other treatment can alleviate the symptoms or reduce the risk." Id. at 16-17. The State argues that "[t]he nature of [Redington's] mental illness is such that it has

34

the potential to substantially impair his thinking and behavior, even if it is not doing so at a given moment . . ." and that Redington's conduct and delusional thought processes exhibited on August 4, 2012 strengthens the evidence that he may present a future risk of physical injury to himself or others, noting specifically that Redington "was incapable of understanding why anyone viewed" his conduct with alarm. Id. at 17-18. The State contends that the evidence presented gave rise to a reasonable belief that Redington has a propensity for emotionally unstable conduct, noting specifically that he has been experiencing visual hallucinations for some time, he sleeps with dozens of guns in and around his bed, he has been asked to leave several churches due to his behavior, he is alienated from his family, and "[h]e walks up to strange people and persists in talking to them about his bizarre premonitions and the spirits who communicate with him without any apparent realization that this behavior is bizarre and unstable." Id. at 19. The State argues that "[b]y his own admission, [Redington] has been traveling to Bloomington every weekend hoping to see Spierer or communicate with spirits who would provide him with information to help find or avenge Spierer" and did so "by going to a parking garage where he could look out onto Kilroy's and range distances to people and areas while armed with multiple loaded guns . . . ." Id. Finally, the State also notes that Dr. Mayer specifically testified that "he was concerned about [Redington's] guns and did not think it was a good idea for [him] to have access to guns." Id. at 17.

We address whether the State proved by clear and convincing evidence that Redington is dangerous pursuant to Ind. Code § 35-47-14-1(a)(2)(B), and specifically that Redington may present a risk of personal injury to himself or another individual in

35

the future and that he is the subject of documented evidence that would give rise to a reasonable belief that he has a propensity for emotionally unstable conduct. In this regard, we find that the record is substantial as to both.

The evidence most favorable to the court's order reveals that Redington was observed by Officer Abram and other officers on the third floor of a parking garage overlooking Kilroy's, the bar at which Spierer was last seen, and he was peering through a range finder while armed with two loaded handguns. He also had a shotgun in his vehicle along with various rounds of ammunition. Redington informed the officers that he was "looking at or for people and at buildings and at lights" and that he had been traveling to Bloomington for the past several weekends to look for Spierer. Transcript at 31. He asked the officers if they "felt with the firearms that [they] carry on duty . . . in a firefight that we would be able to hit someone from sixty-six yards during and in the mist [sic] of a firefight," and stated that "he had ranged what would be approximately sixty-six yards from where he . . . was standing . . . [on] the third floor of the parking garage to . . . where you would come around the corner" the officers used to approach. Id. at 32. He specifically noted that he owned a rifle that "he had sighted in at that distance of sixty-six yards" and that "he could shoot accurately at that distance." Id. at 33-34. These statements alarmed Officer Abram.

After arriving at the police station on August 4, 2012, Redington told Detective Gehlhausen that he had been looking for Lauren Spierer and wanted to avenge her. He also stated that he had dreams about death and told stories including that his father told him that he would see him again after he passed and it came true, that he recalled an

36

incident "about seeing an owl and a black man involved in the Spierer investigation by an ash tree close to Kilroy's," and that once, while attending a church in North Carolina, he envisioned that the pastor's son was committing suicide which turned out to be the case. Id. at 67-68. Detective Gehlhausen asked Redington why he was in Bloomington and Redington specifically responded: "I am in searching of anything I can come up with. Anything. I get kinda weird here, so and I don't, I don't allow myself to be limited to the physical. If I get a funny feeling, that's good enough," before explaining his obsession with Spierer and his belief that he had met her and Rossman, which Detective Gehlhausen knew to be untrue. Exhibit A at 4-5. Redington also spoke about visiting a strip club and paying a stripper resembling Spierer to answer questions and, based upon her responses, thought: "Could she put up a fight? Could she do anything? Could she run? What could she do?" Id. at 25. Redington also claimed that he possessed "[i]nsight" and has a "[s]piritual gift of prophecy." Id. at 44. Detective Gehlhausen's impression of Redington based upon the interview was that he appeared "very delusional," noting also that Redington "would just jump from one conversation to the next" and that he would talk to himself when he was alone and would talk under his breath to himself when in the presence of others. Transcript at 69.

Devon Moore, the Bloomington parking enforcement officer, encountered Redington a week prior to August 4, 2012, and when he attempted to end their conversation and walk away, Redington followed him and told "erratic stories," indicating that he "sees spirits and dark entities" and speaking about Jewish neighbors of his who "molested one of their daughters and [Redington] found out about it and they

37

took him [] up north somewhere and [] let him off in a cornfield," and about how "him and his dad could see dark spirits in his home . . . ." Id. at 9. Redington told Moore that he was in Bloomington to help find Lauren Spierer and that he believed he had previously met her and that "he thought that she would come back and he would see her either through spirit or her physical body." Id. Redington also told Moore that "he had guns on him and it made [him] feel . . . courageous to have" them. Id. at 11. Redington's behavior prompted Moore to phone his boss, and his boss told him that if he observed Redington again he should call the police.

Dawn Goodman, the registered nurse assigned to Redington, observed that he "appeared delusional, grandiose, and [] religiously preoccupied," in that he appeared to be experiencing "a break with . . . reality" and that he claimed "he would know things that would happen beforehand." Id. at 97-98. In addition to talking about the Spierer investigation, Redington told Goodman that he had an ongoing problem with neighbors running through his home, although his wife had not witnessed this, that he did not feel safe at home, that he saw ghosts, and that he hears a small voice in his head.

Dr. Mayer, the psychiatrist who treated Redington, diagnosed him with a schizotypal personality disorder which "is a consolation of a personality characteristics and traits" and specifically has "a flavor of schizophrenia" and is "characterized by someone who tends to be a loner, tends to have magical or odd type of thoughts" and "to be paranoid and suspicious of the intentions of others." Id. at 111. Dr. Mayer's diagnosis was based upon his interactions with Redington as well as speaking with Redington's wife and another therapist who had examined him. In that regard, Redington's wife

38

informed Dr. Mayer that Redington keeps to himself, is alienated from his family, "had had difficulties being able to go to churches" and has been asked on more than one occasion to leave a church because of his behavior. Id. at 112. She also noted that Redington has been asked multiple times to leave Kilroy's. She also confirmed that Redington has experienced visual hallucinations during the course of their thirteen-year marriage. Redington also told Dr. Mayer that he would get information from spirits and would have premonitions. Dr. Mayer could not yet rule out the possibility that Redington had a delusional disorder or a paranoid disorder, and he prescribed Redington Zyprexa, an anti-psychotic medication, as treatment.

The police recovered forty-eight firearms from Redington's residence in which the majority were found in his bedroom, including ten or twelve on the bed and underneath the sheets or tucked underneath the pillows, a few in between the bed and the frame, and another twelve guns underneath the bed. The bedroom also contained several rifle cases, baskets containing handguns, and drawers containing handguns, as well as enough ammunition to probably "fill up the back of a pickup truck." Id. at 74.

At trial when asked if Redington was potentially dangerous, Dr. Mayer replied:

Everyone can be potentially dangerous. Hum, I think that there were some concerns. I think that since [he] was having visual hallucinations this is a real concern and that since he was being paranoid and had obviously many guns there's always the concern that he could visually hallucinate or visually have an illusion of distortion of somebody as being really threatening to him and may in an effort to protect himself or his family end up hurting somebody. So there is a concern in that area.

Id. at 115. Dr. Mayer was asked about Redington's history of sleeping with multiple guns in his bed and he replied:

> [I]t shows a difficulty in exercising a good judgment . . . the difficulties in making rational and good decisions appears to be quite distorted and so yes that is a concern. And [he] does have as part of that schizotypal personality disorder diagnosis there is a fair amount of paranoia. I think he is suspicious by nature and so if you combine that with poor judgment you have a dangerous future potential.

Id. at 116. Dr. Mayer testified that it was his "professional opinion that based on all the information that [he had] available to [him] that [Redington] could pose a potential future risk given that he does have paranoid tendencies, visual hallucination, and other symptoms . . . [that] could impair his judgment." Id. at 123-124.

Finally, we note that Redington testified at the hearing and the court was able to observe him and listen to his testimony. In this regard, we note that the court was able to make these observations of Redington knowing that he had been taking the Zyprexa prescribed by Dr. Mayer since his mental evaluation in Bloomington. Redington was asked about the stories that had been recounted by the witnesses including the story of being left in a cornfield, and he replied:

> That was my English teacher and that's a true story that the family of my English teacher came to visit him and this is a horrible story. The dad had a child by a close relative and that child was a dwarf. That dwarf accused me of stealing an eraser off of him and I didn't do that. So I just flat told him I didn't do it. So the family was going to teach me a good lesson and they pushed me into a car on the way home and drove me out to a cornfield and turned me loose . . . .

Id. at 174-175. Also, Redington explained that he keeps guns in his bed because he has "these cats and if you leave the guns on the floor the cats will urinate on them. And that ruins the barrel. I mean that will ruin a barrel in not [sic] time." Id. at 143. When asked specifically if he ever told Dr. Mayer that he experienced hallucinations, Redington

responded: "You get visions, you get ideas in your head. It's just….these aren't….. this is not delusional." Id. at 157.

Based upon our review of the record, we conclude that evidence of probative value exists from which the court could have determined by clear and convincing evidence that Redington was dangerous as defined by Ind. Code § 35-47-14-1(a)(2)(B), and accordingly it was within its discretion to order the Bloomington Police Department to retain Redington's firearms pursuant to Ind. Code § 35-47-14-6(b).[7]

CONCLUSION

For the foregoing reasons, we affirm the trial court's order to retain firearms.

Affirmed.

BRADFORD, J., concurs with separate opinion.

RILEY, J., dissents with separate opinion.

---

[7] We note that the dissent disagrees with the trial court's determination that the State proved that Redington was dangerous by clear and convincing evidence. The dissent first provides reasons why Redington is not dangerous under Ind. Code § 35-47-14-1(a)(1), and -1(a)(2)(A); however, as explained above, we do not affirm the trial court on this basis. To the extent the dissent discusses the test articulated by Ind. Code § 35-47-14-1(a)(2)(B), specifically regarding a reasonable belief that Redington has a propensity for emotionally unstable conduct, the dissent suggests that although Redington made comments to the police which it acknowledges were "alarming, erratic, and delusional," such comments "do not evince . . . emotional instability." Infra at __. We disagree. Moreover, in addition to Redington's comments to police and the mental health professionals, the record reveals that Redington has a history of exhibiting emotionally unstable conduct as discussed above.

The dissent also notes Redington's marriage, employment history, and lack of criminal record; however these factors do not diminish the other specific facts proven by the State upon which the court relied in determining that Redington exhibited a propensity for emotionally unstable conduct.

41

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ROBERT E. REDINGTON, | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 53A01-1210-CR-461 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

**BRADFORD, Judge, concurring.**

I concur with the majority in all respects. However, I write simply to reiterate that while I have the utmost respect for the constitutionally protected right to bear arms, in the instant matter, I believe that the State met its burden of proving that Redington was "dangerous" as defined by Indiana Code section 35-47-14-1.

During the hearing, the State presented evidence establishing that Redington suffered from a schizotypal personality disorder, exhibited delusional thought patterns that continued despite the anti-psychotic medication that he was prescribed to take, and engaged in arguably unstable behavior. For example, while armed, Redington would, on numerous occasions, travel to Bloomington from Indianapolis and park in a third story parking lot where he would use a range finder to scope out the distance from the parking

42

lot to different locations around Kilroy's Bar-N'Grill. He did so in the hopes of seeing Lauren Spierer or communicating with spirits whom he believed could provide him with information to help him find Spierer or avenge her disappearance.

Additionally, mental health professionals opined that Redington may suffer from a delusional disorder or a paranoia disorder in addition to schizotypal personality disorder. Redington exhibited an unhealthy obsession with the Spierer disappearance and told police officers and medical professionals, among others, that he "feels the 'negative energy' of death all around him, believes bizarre 'dreams' or premonitions that he has (often involving dead people) come true or really happened." Appellee's Br. p. 13. In addition, Redington claimed to have suffered visual hallucinations, and Dr. Mayer indicated that there was concern that Redington could harm someone during one of his visual hallucinations.

The trial court also had the opportunity to observe Redington during trial and to listen to his testimony. Redington testified that he was taking his prescribed medications as ordered. The trial court, however, was not obligated to believe this self-serving testimony.

Furthermore, while I don't believe that one should be considered dangerous merely because they own a large number of firearms, I do not believe the trial court made its determination on this fact alone. The trial court appeared to have considered the large number of firearms owned by Redington, but this factor does not appear to have been an overwhelming factor in the trial court's decision. The trial court also seems to have given great weight to the ample other evidence relating to Redington's unstable mental state

43

and behavior, his seemingly unhealthy obsession with the Spierer disappearance, the trial court's observations of Redington, and the lack of seemingly credible evidence that Redington was complying with the treatment plan established by the mental health professionals treating him.

In addition, as the majority opinion correctly points out, prior attempts to regulate and limit Article I, Section 32 and the Second Amendment have been found to be constitutional. *See* Ind. Code § 35-47-4-5; *McDonald v. City of Chicago, Ill.*, 130 S.Ct. 3020, 3047 (2010) (providing that a variety of state and local laws concerning the regulations of firearms have been upheld); *District of Columbia v. Heller*, 554 U.S. 570, 626, 128 S.Ct. 2783, 2816-17 (2008) (providing that the right secured by the Second Amendment is not unlimited and recognizing that there are wide-ranging and long-standing prohibitions on the possession of firearms by felons and the mentally ill); *Baker v. State*, 747 N.E.2d 633, 637 (Ind. Ct. App. 2001). Our legislature has chosen to regulate the right to bear arms as a matter of public safety. I believe it is within the province of the legislature's duties to do so.

Thus, in light of the fact that Redington was found to be "dangerous" coupled with the relevant controlling State and Federal authority which demonstrates that certain attempts to regulate Article I, Section 32 and the Second Amendment have been found to be constitutional, I agree that Indiana Code section 35-47-14-1 *et seq.* is not unconstitutional as applied to Redington and join the majority's conclusion that the judgment of the trial court should be affirmed.

44

# IN THE
# COURT OF APPEALS OF INDIANA

ROBERT E. REDINGTON,            )
                            )
     Appellant-Respondent,     )
                            )
           vs.             )     No. 53A01-1210-CR-461
                            )
STATE OF INDIANA,            )
                            )
     Appellee-Petitioner.      )

**RILEY, Judge, dissenting**

I respectfully dissent from the majority's decision to affirm the trial court's Order seizing and retaining Robert Redington's (Redington) firearms and suspending his firearms license. Ind. Code § 35-47-14-6(b) permits the trial court to order firearms forfeiture and license suspension only if the State "has proved by clear and convincing evidence that the individual is dangerous." "Dangerous" is defined by I.C. § 35-47-14-1, which provides two alternative tests to determine whether an individual is dangerous. The first test is based on an individual's risk of imminent harm to himself or others; the second, on the individual's risk of future harm to himself or others. In my view, a reasonable trier of fact could not find that Redington was dangerous under I.C. § 35-47-14-1.

Pursuant to I.C. § 35-47-14-1(a)(1), an individual is dangerous if he "presents an imminent risk of personal injury" to himself or another. Dr. Carey C. Mayer (Dr. Mayer), the licensed psychiatrist who examined Redington following his involuntary commitment to Indiana University Hospital, testified as follows:

> [DR. MAYER]: […]. At the time that somebody is discharged from the hospital our duty at that point is to ascertain if they are in imminent danger upon themselves or others.
>
> […]
>
> [DR. MAYER]: We felt that [Redington] was not in imminent danger. If we thought that he was[,] we would have kept him longer in the hospital until just [the] time that he [was] no longer [] [an] imminent danger.

(Transcript p. 124).

The State argues that the trial court was not obligated to agree with that opinion given the other evidence regarding Redington's mental health. However, testimony from other witnesses, including police officers, a nurse at Indiana University Hospital, and Redington, establishes only that Redington suffers from mental health issues and is a gun buff. Their testimony does not contradict Dr. Mayer's opinion nor establishes that Redington posed an imminent risk of harm to himself or others. The State argues that even if Redington did not pose an imminent risk at the time of his mental examination, the trial court was not obliged to believe that he would not pose a risk of imminent harm at the time of the forfeiture hearing. To that end, the State asks that an inference be drawn from Redington's poor judgment in purchasing firearms following the incident and Dr. Mayer's opinion that Redington's mental illness has the potential to manifest so as to present an imminent risk of harm. I do not find this a reasonable inference. No showing

46

was made that linked the purchase of additional firearms to a conclusion that Redington presented an imminent risk of harm to himself or others.

Under the second test, an individual who "may present a risk of personal injury" to himself or others in the future may also support a finding that the person is dangerous. *See* I.C. § 35-47-14-1(a)(2). This second test is stated in the disjunctive and therefore a person is dangerous if he:

> (A) has a mental illness (as defined in [I.C. §] 12-7-2-130) that may be controlled by medication, and has not demonstrated a pattern of voluntarily and consistently taking the individual's medication while not under supervision; or,
>
> (B) is the subject of documented evidence that would give rise to a reasonable belief that the individual has a propensity for violent or emotionally unstable conduct.

I.C. § 35-47-14-1(a)(2)(A&B).

The State did not produce evidence that would support a finding under I.C. § 35-47-14-1(a)(2)(A). Ind. Code § 12-7-2-130 defines "mental illness" as one that "substantially disturbs feelings, thinking, and behavior, and impairs the ability to function." Although Dr. Mayer testified that Redington has a mental illness, he stated that Redington did not have the "kind of a mental illness" to which I.C. § 12-7-2-130 applies. (Tr. p. 131). Even assuming that Redington had a mental illness under I.C. § 12-7-2-130, additional evidence is required to show that the mental illness "may be controlled by medication" and Redington has not demonstrated a pattern of voluntary and consistent use of the medication while unsupervised. Here, the only evidence regarding such pattern was offered by Redington, who provided receipts for the medication prescribed by Dr. Mayer and testified that he consistently has taken the medication.

47

The remaining test requires documented evidence giving "rise to a reasonable belief" that Redington has a propensity for violent or emotionally unstable conduct. I.C. § 35-47-14-1(a)(2)(B). However, the State's evidence, though demonstrating that Redington has a mental illness and possesses numerous firearms, does not give rise to a reasonable belief that he has a propensity for violent or emotionally unstable conduct. It is undisputed that Redington broke no law, committed no violent act, responded peacefully when confronted by police officers, and did not threaten to harm himself or anyone else. His comments to the police, though alarming, erratic, and delusional, do not evince violence or emotional instability. Moreover, Redington has never been arrested, has no criminal history, and has been married for 12 years. He is employed as a machinist for a company where he has worked for approximately 35 years. These facts do not show emotional instability.

In light of the statutory requirements and without probative evidence or reasonable inferences satisfying the same, I cannot conclude that the trial court properly found Redington dangerous under I.C. § 35-47-14-1. Under these circumstances, I find the concerns of the California Court of Appeals noteworthy:

> Absent assessment and evaluation by trained mental health professionals, the seizure and loss of weapons would depend solely on the necessarily subjective conclusion of law enforcement officers who may or may not have the mental health training and experience otherwise available at a designated mental health facility.

*City of San Diego v. Kevin B.*, 13 Cal.Rptr.3d 450, 455 (Cal. Ct. App. 2004). Here, the mental health professional who assessed Redington provided testimony establishing that

48

Redington was not dangerous under I.C. § 35-47-14-1 and the State provided no further

probative evidence establishing otherwise.  I would therefore reverse the trial court.