

FILED

Apr 05 2019, 9:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Guy A. Relford
The Law Office of Guy A. Relford
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy
Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Robert E. Redington, *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, *Appellee-Petitioner.* | April 5, 2019 <br><br> Court of Appeals Case No. 18A-CR-950 <br><br> Appeal from the Monroe Circuit Court <br><br> The Honorable Mary Ellen Diekhoff, Judge <br><br> Trial Court Cause No. 53C05-1208-MC-1375 |

**Robb, Judge.**

# Case Summary and Issue

In 2004, Indianapolis Police Department officer Jake Laird was shot and killed in the line of duty. The man who shot him had been temporarily committed for a mental health evaluation several months earlier and his cache of weapons was confiscated at that time. When the man was released from the hospital and requested the return of his weapons, IPD returned the firearms because they had no legal authority to retain them. Five months later, Officer Laird was killed. In response to the shooting, Indiana became the second state in the nation to enact a "red flag law" (known as the "Jake Laird Law" in honor of the fallen officer).[1] "Red flag laws" generally allow law enforcement to seek a court order temporarily restricting a person's access to firearms if that person shows "red flags" of being a threat of danger to themselves or others.[2] In giving the people who notice the "red flags" the tools necessary to intervene before it is too late, these laws must straddle the tension between protecting a person's Second Amendment right to bear arms with recognizing and working to stem the overwhelming tragedy that can be wrought by gun violence.

---

[1] In 1998, a disgruntled employee at the Connecticut Lottery who had previously shown signs of being troubled gunned down four of his bosses before turning the gun on himself. That tragedy prompted Connecticut to enact the first red flag law. *See* Opinion, "Lawmakers should study the early success of Maryland's red-flag law," The Washington Post, Jan. 20, 2019 (found at https://www.washingtonpost.com/opinions/lawmakers-should-study-the-early-success-of-marylands-red-flag-law/2019/01/20/a0e83918-1aca-11e9-88fe-f9f77a3bcb6c_story.html?utm_term=.12bbcd221157, last visited Mar. 15, 2019).

[2] Prior to February 2018, five states including Indiana had red flag laws. After the February 14, 2018, shooting at Marjory Stoneman Douglas High School in Parkland, Florida, at least eight other states and the District of Columbia have enacted a red flag law.

[2]     This case is a classic example of that tension and the fine line that a preemptive determination must observe, especially when it affects constitutional rights. In 2012, Robert Redington's numerous firearms were seized by police pursuant to Indiana's red flag law. After a hearing, the trial court determined the State had proven by clear and convincing evidence that Redington was dangerous and ordered his firearms to be retained by law enforcement. Almost three years later, Redington filed a petition seeking the return of his firearms. At the required hearing, Redington presented testimony from a psychiatrist supporting his position, the State presented no evidence, and the trial court took judicial notice of the prior proceedings. The trial court found Redington had not met his burden of proving by a preponderance of the evidence that he is not dangerous and denied Redington's petition. Redington now appeals, arguing the trial court's order denying the return of his firearms was clearly erroneous because he presented "overwhelming and wholly unrebutted evidence" that he is not presently "dangerous" as defined by statute and the State declined to present any evidence on that issue. Amended Appellant's Brief at 6.

[3]     In interpreting the relevant statutes as written and passed by the legislature, without adding language we would prefer or deleting provisions we do not, we conclude that Redington proved by a preponderance of the evidence that he is not dangerous as that term is defined by statute. Because the State failed to present any current evidence to the contrary, the trial court's decision is contrary to law. We therefore reverse and remand.

# Facts and Procedural History

## I. Prior Proceedings ("*Redington I*")

The underlying facts of this case are set out in detail in Redington's first appeal, *Redington v. State*, 992 N.E.2d 823 (Ind. Ct. App. 2013), *trans. denied.* Briefly, however, Redington came to the attention of Bloomington police in July 2012 when he was found in a downtown parking garage behaving strangely twice in the same week. During the first encounter, Redington approached a parking enforcement officer and volunteered rambling tales about, among other things, a time he thought he might have killed a man at a gun range but then found out the man had killed himself, his interest in the Lauren Spierer case,[3] and his ability to see "spirits and dark entities." *Id*. at 825. Redington also told the officer "he had guns on him and it made [him] feel . . . courageous to have" them. *Id.* After the encounter ended, the parking officer called his supervisor, who told him to call the police if he saw Redington again.

Approximately one week later, the same officer saw Redington in the same parking garage looking through binoculars toward Kilroy's Sports Bar[4] and called police. Bloomington Police Department ("BPD") officers responded and observed Redington on the third floor of the parking garage holding a range finder. With guns drawn, they approached Redington, who put his hands up

---

[3] Lauren Spierer is an Indiana University student who disappeared in June 2011.

[4] One of the last places Spierer was seen before her disappearance was Kilroy's Sports Bar.

and told the officers he had a gun. The officers recovered two guns from Redington's pockets and a shotgun and ammunition from his truck. When asked why he was there, Redington again referenced Spierer, mentioned that he had previously met her at a gun range and told her that he felt she was in some sort of danger, stated that he had come to Bloomington several times to look for her, and noted that he "ranged [from his position in the garage] to somewhere near the back of Kilroy's as being approximately sixty-six yards [and] he could shoot accurately at that distance." *Id.* at 826. He also noted it was approximately sixty-six yards from where he was standing to where the officers had entered the third floor. Redington stated that he owned several other guns.

[6] Redington's statements alarmed the officers and they asked him to come to the police station to talk with a detective assigned to the Spierer case. Redington agreed and drove himself to the station. The interview was riddled with strange stories and falsehoods, and Redington stated he wanted to avenge Spierer. The detective conducting the interview thought Redington was "very delusional," as he jumped from one conversation to the next and would talk to himself when left alone and under his breath to himself when in the presence of others. *Id.* at 827. Following the interview, Redington was transported to the IU Health Center on a 72-hour hold for a psychiatric evaluation. The nurse who handled his admission said he seemed to be experiencing a break with reality. Redington told her that his neighbors were running through his home, even though his wife had not witnessed any intruders; he did not feel safe at home;

he saw ghosts; and he hears a voice in his head. Psychiatrist Carey Mayer treated Redington during his evaluation.

[7] The same night Redington was taken to the hospital, BPD obtained authorization to retain the three firearms seized from Redington and a search warrant to search his house in Indianapolis for other firearms. Officers executing the search warrant at Redington's home found guns scattered throughout the home as well as "enough ammunition to probably fill up the back of a pickup truck." *Id.* Most of the firearms were found in Redington's bedroom, including one in between the mattress and the frame and another twelve under the bed. Police recovered forty-eight firearms from Redington's home, including rifles equipped with scopes, handguns, and shotguns, for a total of fifty-one firearms removed from Redington's possession.

[8] The State filed a petition pursuant to Indiana Code section 35-47-14-5 to retain Redington's firearms alleging Redington was a "dangerous" individual as defined by Indiana Code section 35-47-14-1. The trial court held a hearing as required by statute at which Dr. Mayer testified to his impressions from both treating Redington and gathering information from Redington's wife and other personnel at the hospital who interacted with him. Specifically, he testified that he believed Redington suffered from a schizotypal personality disorder and had not ruled out the possibility that Redington had a delusional or paranoid disorder. He prescribed an antipsychotic medication and recommended that Redington pursue out-patient treatment. But he had released Redington because he did not believe him to be an imminent danger to himself or others.

Nonetheless, "[e]veryone can be potentially dangerous[,]" and Dr. Mayer had "some concerns[,]" based on Redington's history of visual hallucinations, paranoia, and multitude of guns, that he had "a dangerous future potential." *Id.* at 844. Dr. Mayer summarized that his professional opinion based on all the information available to him was that Redington "could pose a potential future risk[.]" *Id.* After the hearing, the trial court issued its order granting the State's motion to retain the firearms, concluding without further explanation that the State "has proved by clear and convincing evidence that [Redington] was dangerous as defined by I.C. 35-47-14-1[.]" *Id.* at 828. The court also ordered Redington's license to carry a handgun be suspended.

[9] Redington appealed, arguing Indiana Code chapter 35-47-14 was unconstitutional and the evidence that he was "dangerous" was insufficient to order retention of his firearms. With respect to the constitutionality of the statute, *Redington I* held unanimously that the statute does not violate Article 1, section 32 of the Indiana Constitution; does not violate Article 1, section 21 of the Indiana Constitution or the Fifth Amendment to the United States Constitution; and is not void for vagueness. *See id.* at 835, 837, 839. Specifically of interest to this case, as to the right to bear arms protected by Article 1, section 32 of the Indiana Constitution, the court held the statute did not place a material burden on Redington's right to bear arms because chapter 35-47-14 provides a mechanism for an individual to regain his right to carry a handgun as well as to recover his seized firearms. *Id.* at 834. And as to the vagueness argument, the court held that the definition of "dangerous" is not

vague because the legislature drew the line between trivial and substantial acts or omissions by specifying "the circumstances in which a court may find an individual to be dangerous in the future." *Id.* at 839.

[10] A majority of this court affirmed the trial court's order with regard to the sufficiency of the evidence:

> Based upon our review of the record, we conclude that evidence of probative value exists from which the court could have determined that Redington was dangerous as defined by Ind. Code § 35-47-14-1(a)(2)(B), and accordingly it was within its discretion to order the Bloomington Police Department to retain Redington's firearms pursuant to Ind. Code § 35-47-14-6(b).

*Id.* at 845. The majority specifically noted that it did *not* affirm the trial court on the basis of section 35-47-14-1(a)(1) (individual presents an "imminent risk of personal injury" to self or someone else) or section 35-47-14-1(a)(2)(A) (individual may present a risk to self or someone else in the future and has a mental illness with pattern of not taking medication), but *only* on the basis of section 35-47-14-1(a)(2)(B) (may present a risk to self or someone else in the future and has a propensity for "violent or emotionally unstable conduct"). *Id.* at 845 n.7. Judge Riley dissented as to the sufficiency issue. Specifically, Judge Riley noted the following testimony of Dr. Mayer:

> At the time that somebody is discharged from the hospital our duty at that point is to ascertain if they are in imminent danger upon themselves or others.
>
> * * *

> We felt that [Redington] was not in imminent danger. If we thought that he was[,] we would have kept him longer in the hospital until just [the] time that he [was] no longer [ ] [an] imminent danger.

*Id.* at 847. Accordingly, Judge Riley concluded "the mental health professional who assessed Redington provided testimony establishing that Redington was not dangerous under I.C. § 35-47-14-1 and the State provided no further probative evidence establishing otherwise." *Id.* at 848. Redington sought transfer to the supreme court, but his petition was denied on November 7, 2013.

## II. Current Proceedings

[11]     On June 29, 2015, Redington filed a petition for return of his firearms pursuant to Indiana Code section 35-47-14-8. A hearing on the petition was held on January 17, 2018. In support of his petition, Redington offered his own testimony, that of his wife, and that of Doctor Shaun Wood, a psychiatrist. He also offered into evidence statements by two additional treatment providers. Generally, the testimony showed that Redington has never been arrested or convicted of a crime, he has never threatened anyone, he has been gainfully employed for decades, and he remains in a long-term marriage.

[12]     Penny Redington, Redington's wife of seventeen years, testified that Redington is "very laid back . . . very generous. Kind, caring." Transcript, Volume 2 at 9. She said he had firearms before they were married and "[h]e is very meticulous about keeping his firearms clean and in good working order. He has never pointed a firearm at anyone that I have ever seen. He basically uses his

firearms for hunting." *Id.* at 10. She described how, at the time of the first hearing, they had a gun safe that held twelve to fifteen firearms but it was full, so they had firearms "in every room basically. They were not loaded." *Id.* Since that hearing, they have acquired an additional gun safe and have agreed that "fifty-one firearms is a lot of firearms to have. So he said if he actually gets some of them back he would try and sell some of them. . . . His intention is to cut back." *Id.* at 11. Penny had never seen Redington threaten anyone with a gun or handle a firearm unsafely and she had no concerns whatsoever about Redington's firearms being returned to him:

> He is not a violent person. He has never been a violent person. He has never been arrested or charged with anything. The only thing that he has ever had is a traffic ticket for not wearing his seatbelt. . . . He is so laid back it's not in his character.

*Id.* at 14. On cross-examination, Penny denied Redington had ever talked with her about "death following him" or a "ghost or spirit following him," but she acknowledged they are both very religious and "believe that there are spirit entities." *Id.* at 15-16. Penny further acknowledged Redington's interest in the Spierer case and that he believes he has the "gift of prophecy . . . [t]hat he can sense things before they happen." *Id.* at 18. Penny also acknowledged that Redington had purchased a gun after his guns were seized, but said that he had returned it the next day and they currently have no firearms in the house.

[13]  Redington testified on his own behalf. He testified that he was employed as a machinist for most of his life. He had been at his current job for approximately

three years. Before that, he had been employed for twenty-five years at CMW until the company was closed and all employees were laid off. He had never been disciplined while working at CMW and his priority, for himself and those he trained, was safety because "[t]hose machines don't forgive you." *Id.* at 22. Redington testified that he has never been arrested or even been in a fight. Redington said that he previously had concerns about people running through his house because he heard footsteps, but he never felt a sense of danger and he no longer has those concerns. When asked why he had guns, he replied, "As a kid we always had guns. . . . I was always interested in deer hunting . . . ." *Id.* at 26. Redington did not believe the court should be concerned about returning his firearms because "[t]hings are safe. I am also going to downsize." *Id.* at 30.

[14] At the request of CMW, Redington had undertaken counseling to determine his fitness for work after the underlying events of *Redington I*. He acknowledged that he had undergone counseling during his testimony but had little to say about it. Redington counseled with Michael Fallahay at Hope Counseling from October 23, 2012 through March 5, 2013, attending eight scheduled sessions. Fallahay described himself as an "Individual, Couple, and Family Therapist" and stated that he is "neither a licensed clinical psychologist nor a forensic psychologist." Exhibit Index, Volume 1 at 6. Redington was also evaluated by Andrew Brothers, a psychologist at Indiana Health Group, on September 26, 2012. Their reports were reviewed by Dr. Wood as part of his evaluation of

Redington and were admitted into evidence at the hearing.[5] The reports were addressed to CMW and, in assessing Redington's fitness to return to the workplace, essentially stated that Redington was not "dangerous" pursuant to the statutory definition. The Hope Counseling report stated, "While his thoughts may seem unusual at times to others, he has never in my presence expressed any desire or intention to harm another person or location." Exhibit Index, Volume 1 at 6. Brothers concluded "it is not possible to substantiate that he is an 'imminent' risk of harm to himself or others at this time in a manner that would preclude his ability to engage in effective work functioning as a machinist." *Id.* at 8.

[15] Finally, Dr. Wood testified. He met with Redington in 2016 and reviewed the 2012 reports made by Hope Counseling Ministries and Indiana Health Group as well as the medical records submitted during the *Redington I* proceedings. Based on Redington's lack of violent history, his history of stable and long-standing employment, and the nature of his marital relationship, Dr. Wood opined that Redington does not have a mental illness, as that term is defined by statute, nor does he have a personality disorder. Further, Dr. Wood testified:

---

[5] These reports were offered into evidence during Dr. Wood's testimony. The State objected, and the court ruled that even though it believed the State's objection was proper, it was "going to admit them anyway. Because I do believe that the more information that the Court has will be more beneficial in this hearing" because it was "a close determination as to whether Mr. Redington is competent under the statute to be able to retrieve his guns." Tr., Vol. 2 at 39. The trial court allowed the reports only for the purpose that Dr. Wood "used these to help formulate whatever opinion, I am assuming, you [are] going to have him put before the Court." *Id.* at 40. Neither Fallahay nor Brothers appeared to testify at the hearing.

> He presents no risk. He presents no danger. There is no bases [sic] to which even make that ascertain [sic].
>
> * * *
>
> [F]or a person to say may present a danger in the future or a risk of whatever there has to be a factual basis today to assert that at some point in time this would be behavior that they would repeat or this fact presents a precursor for this behavior in the future. We have not been able to confirm any risk based, evidence based, historical based, fact or data point to say that he represents a future risk.

Tr., Vol. 2 at 46-47. Dr. Wood also testified that Redington "is less likely than the average citizen to have any [propensity] for emotional instability. Given his typical way of coping and dealing." *Id.* at 49. Similarly, Dr. Wood's written report concluded:

> Mr. Redington has no history of violent behavior, illness causing violence, nor demonstrated propensity for violence. None of his records reviewed demonstrated any factual evidence nor basis on which to assert a propensity for violence. He has interpersonal oddities in the way he relates and expresses himself but, the discomfort a person . . . might feel in response to this interpersonal style is not a basis to assert a propensity for violence.

Exhibit Index, Vol. 1 at 14.

[16] The State offered no evidence but did request the trial court take judicial notice of the proceedings in *Redington I*. Redington did not object to the trial court doing so, "with a caveat":

[W]hat brings us here today is Mr. Redington['s] request for a hearing on the issue of whether quote unquote no longer having the Court rule as it did in [2012]. That is the issue and it recognizes that a person could have been found dangerous in a previous proceeding. The issue today as defined by statute is whether he is no longer dangerous. With the State having offered no testimony or evidence as to Mr. Redington's current mental health we would submit that everything submitted today is completely unrebutted and refuted [sic] since the statute recognizes that someone may be dangerous on one date and no longer dangerous on a different date.

Tr., Vol. 2 at 56.

[17] The trial court issued its order on February 16, 2018, denying Redington's petition. In relevant part, the trial court found:

*Respondent did not present credible evidence to show that circumstances have changed since the initial hearing in this matter.*

At the time of the initial hearing, when Respondent's firearms were seized and retained by the Order of this Court, Respondent had been employed with the same employer ("CMW") for an extended period of time and had been married for twelve years. Respondent spoke of seeing spirits and possessing the gift of prophecy. Moreover, Respondent believed that neighbors were entering and running through his home based on noises he would hear. This Court, and subsequently the Court of Appeals, found Respondent to be dangerous as defined by I.C. 35-47-14-1, and ordered the seized firearms to remain in the custody of the Bloomington Police Department.

At the hearing on January 17, Respondent testified that he is no longer employed with CMW and has since held two jobs after being laid off by CMW. While his termination was due to the

company shutting down, Respondent had been placed on leave following the initial Court Order and required to undergo a "Fitness for Duty" examination. Respondent is still married. Respondent testified on January 17, 2018, that he believes people were in his home in the past and has, just recently, made comments to his wife about hearing noises in the house. Both Respondent and Respondent's wife testified to his continued belief that Respondent has the gift of prophecy.

* * *

Respondent relies heavily on the testimony of Dr. Wood as evidence that Respondent is not dangerous. Dr. Wood disagrees with the prior finding that Respondent is dangerous *but does not provide any credible evidence to show that anything has changed since the initial hearing.* Dr. Wood's opinion of Respondent is bolstered by two separate evaluations that were conducted to determine whether Respondent would pose a danger under specific circumstances at a specific time, and only one of those assessments was conducted by a medical professional. *Respondent has failed to show how either his behavior or the circumstances from the initial hearing in this action have changed in such a way that would show that he is not dangerous.* While Respondent does maintain employment and his marriage is still intact, these factors existed prior. But since the initial hearing, Respondent went out and purchased another firearm despite the order seizing his other firearms and suspending his license. Respondent still believes that he has heard people in his home and that he has the gift of prophecy, despite having taken medication to address a diagnosed personality disorder. He no longer attends counseling sessions that were recommended. Furthermore, Respondent does not offer any reason as to why this Court should find him not dangerous when asked if there should be concern with regard to returning the firearms.

Finally, at the hearing on January 17, 2018, Respondent noted that the State did not rebut any of the evidence given nor call any witnesses to show Respondent is dangerous. Pursuant to I.C. 35-47-14-8(d)(2), the burden is on the Respondent to show by a preponderance of the evidence that he is not dangerous. The State does not have a burden to once again prove that Respondent is a danger.

Appealed Order at 1-3 (emphasis added). Accordingly, the trial court denied Redington's petition, ordered that Redington's firearms remain in the custody of BPD, and ordered that Redington's license to carry a handgun remain suspended. Redington now appeals.

# Discussion and Decision[6]

## I. Relevant Statutes

[18] Indiana's procedure for the seizure and retention of a firearm owned by an allegedly dangerous individual is described in Indiana Code chapter 35-47-14. In 2012, BPD used this procedure to seize Redington's firearms because BPD believed, and the trial court found probable cause to believe, that Redington was dangerous. *See* Ind. Code § 35-47-14-3 (pursuant to which the firearms Redington was carrying were immediately seized and the trial court later found probable cause) and Ind. Code § 35-47-14-2 (pursuant to which a warrant was issued to search Redington's house). The trial court then held a hearing as

---

[6] We held oral argument in this case on February 26, 2019 in the Court of Appeals courtroom in Indianapolis, Indiana. We thank counsel for their presentations.

required by section 35-47-14-5 to determine whether the firearms should be returned to Redington or retained by police. At the hearing, the burden was on the State to prove all material facts by clear and convincing evidence. Ind. Code § 35-47-14-6(a). The question to be answered was whether or not Redington was a "dangerous" individual as defined by statute:

> (a) For the purposes of this chapter, an individual is "dangerous" if:
>
> (1) the individual presents an imminent risk of personal injury to the individual or another individual; or
>
> (2) the individual *may present a risk of personal injury* to the individual or to another individual *in the future and* the individual:
>
>> (A) has a mental illness (as defined in IC 12-7-2-130) that may be controlled by medication, and has not demonstrated a pattern of voluntarily and consistently taking the individual's medication while not under supervision; or
>>
>> (B) is the subject of *documented evidence* that would give rise to *a reasonable belief* that the individual has a propensity for violent or *emotionally unstable conduct*.

Ind. Code § 35-47-41-1(a) (emphasis added). After hearing evidence from BPD officers, IU Health Center personnel including Dr. Mayer, Redington, and Redington's wife, the trial court determined the State proved by clear and convincing evidence that Redington was "dangerous" and therefore, ordered

BPD to retain Redington's firearms and suspended Redington's license to carry a handgun. *See* Ind. Code § 35-47-14-6(b).

[19] Indiana Code section 35-47-14-8(a) provides that after at least 180 days have passed from such an order being issued, the individual may petition the court for return of the firearms. The trial court's order to retain Redington's firearms was issued on September 19, 2012. Redington filed his petition for their return on June 29, 2015. In this proceeding, Redington was required to prove "by a preponderance of the evidence that [he] is not dangerous." Ind. Code § 35-47-14-8(d)(2). Having been denied the return of his firearms on this first request, Redington must wait at least 180 more days before filing a subsequent petition seeking their return. Ind. Code § 35-47-14-8(f). If at least five years pass without the firearms being returned to Redington, the court may order the police department to dispose of the firearms.[7] Ind. Code § 35-47-14-9. If the firearms are to be disposed of, the court must first give notice to the parties and conduct a hearing, but section 9 gives no guidance as to who may request disposal, what the hearing must address, or who has the burden of proof.

[20] This chapter has been substantively addressed in exactly one case: *Redington I*. Therefore, the section allowing an individual to petition for return of firearms has yet to be construed.

---

[7] At any time after a retention order is issued, the individual may request the court order the law enforcement agency to sell the firearms at an auction and return the proceeds, less costs, to the individual. Ind. Code § 35-47-14-10.

# II. Standard of Review

[21]    "On appeal of claims tried by the court without a jury . . . the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."  Ind. Trial Rule 52(A); *see also Merlington v. State*, 839 N.E.2d 260, 262 (Ind. Ct. App. 2005) (noting when reviewing a ruling on a motion for return of property seized during an arrest, "we are reviewing a case tried to a court without a jury, and therefore we will not reverse unless the decision is clearly erroneous and cannot be sustained upon any legal theory supported by the evidence").  We define the clearly erroneous standard based upon whether the party is appealing a negative judgment or an adverse judgment.  *Fowler v. Perry*, 830 N.E.2d 97, 102 (Ind. Ct. App. 2005).  Because the trial court entered an order against Redington, who had the burden of proof, he is appealing from a negative judgment.  *See Garling v. Ind. Dep't of Nat. Res.*, 766 N.E.2d 409, 411 (Ind. Ct. App. 2002), *trans. denied*.  We will reverse a negative judgment only where the decision of the trial court is contrary to law.  *Kotsopoulos v. Peters Broadcast Eng'g*, 962 N.E.2d 97, 105 (Ind. Ct. App. 2011).  In determining whether a trial court's decision is contrary to law, we must determine if the undisputed evidence and all reasonable inferences to be drawn from that evidence lead to but one conclusion, and the trial court has reached a different conclusion.  *Id.*

# III.  Petition for Return of Firearms

[22]  By statute, Redington was required to prove by a preponderance of the evidence that he "is not dangerous" in order to have his firearms returned to him.  Ind. Code § 35-47-14-8(d)(2).  "Preponderance of the evidence" "simply means the greater weight of the evidence." *Kishpaugh v. Odegard*, 17 N.E.3d 363, 373 (Ind. Ct. App. 2014) (quotation omitted).

[23]  The parties agree that the basis for retaining Redington's firearms in 2012 was a finding pursuant to Indiana Code section 35-47-14-1(a)(2)(B) that he "may present a risk of personal injury to [himself] or to another individual in the future and [he] is the subject of documented evidence that would give rise to a reasonable belief that [he] has a propensity for violent or emotionally unstable conduct." *See Redington*, 992 N.E.2d at 842 (holding "the record is substantial" as to both a future risk and propensity for emotionally unstable conduct); Amended Br. of Appellant at 25 (noting *Redington I* "only affirmed the trial court's determination that Redington was 'dangerous' under I.C. § 35-47-14-1(a)(2)(B)"); Brief of Appellee at 13 ("The trial court previously found, and this Court previously affirmed, that the State had proved by clear and convincing evidence that [Redington] was dangerous under subsection (a)(2)(B) of the statute in that he posed a risk of harm in the future due to his documented emotionally unstable conduct.").

[24]  Based on that agreement, Redington argues that because the original finding he was "dangerous" was based on the possibility of *future* conduct, there is no

legitimate way for him to prove that he is no longer dangerous if the standard is as the trial court stated: that he must show either his behavior or his circumstances have changed since the first hearing. *See* Appealed Order at 1. He argues that the trial court's interpretation would make section 35-47-14-8 illusory and call into question this court's holding in *Redington I* that the statute is constitutional, a holding that was based in part on the "magnitude of the [statute's] impairment" on his Second Amendment right being lessened due to the possibility of regaining his right to carry a firearm through the statutory process. *See* 992 N.E.2d at 834. Redington points out that he presented "the only possible evidence available on the issue of his likelihood of becoming a danger in the future[,]" Amended Br. of Appellant at 26, the unrefuted expert testimony of Dr. Wood that he was not a risk, now or in the future, of causing personal injury to himself or others; was not emotionally unstable; and has no propensity for violence. Redington also notes that he is not asking this court to reweigh the evidence in his favor because "there is simply no evidence to place on the State's side of the scale." *Id.* at 27.

[25] The State, on the other hand, agrees with the trial court's formulation of the standard under section 35-47-14-8 and succinctly states in its Summary of Argument what it believes Redington needed to show to meet his burden:

> The evidence presented by [Redington] did nothing to rebut the evidence which previously established [his] dangerousness because it did not demonstrate any way in which those circumstances had changed during the intervening years. Testimony from [Redington's] witnesses showed there had been no changes in his emotional stability or in his delusional beliefs.

> [Redington] has not received any mental health treatment during the intervening years that has improved his psychiatric problems or ameliorated the manifestations of those problems.

Br. of Appellee at 11. The State posits that the 2012 evidence established that Redington was dangerous, "and that status remained in effect unless and until [Redington] showed that the prior evidence was no longer applicable to his current state." *Id.* at 23. Therefore, the State contends that it was not required to present new evidence to prove that Redington was still dangerous.[8] The State also argues the trial court was not required to believe Dr. Wood's testimony at the current hearing over Dr. Mayer's testimony at the 2012 hearing and therefore, Redington's evidence was not wholly unrebutted because the trial court took judicial notice of the 2012 proceedings.

[26] "In a hearing on a petition [to return firearms], the individual . . . must prove by a preponderance of the evidence that the individual *is not dangerous*." Ind. Code § 35-47-14-8(d)(2) (emphasis added). Moreover, the definition of "dangerous" requires a determination that a person "*has* a propensity for violent or emotionally unstable conduct" in the future. Ind. Code § 35-47-14-1(a)(2)

---

[8] Of note, Indiana Code chapter 35-47-14 does not put a time limit on the trial court's initial retention order. *Contra* Conn. Gen. Stat. § 29-38c(d) (1999) (an order that firearms be confiscated may be issued for a period not to exceed one year); Vt. Stat. tit. 13 § 4053(e)(2) (an order may be issued for a period of up to six months). In fact, our survey of the other thirteen red flag laws shows that they *all* impose a time limit on the initial retention order, and if the petitioner wishes to extend the order beyond its original limit, it must petition the court before the expiration of the order and again prove that the individual meets the criteria. *See, e.g.,* Cal. Penal Code § 18190; 430 Ill. Comp. Stat. 67/45(b); *but see* Conn. Gen. Stat. § 29-38c (one year limit with no provision for renewal). In addition, several other red flag laws allow not just law enforcement but also family members to petition for a retention order. *See* Cal. Penal Code § 18150(a).

(emphasis added). Based on the plain language of this statute, Redington had to prove that he is not *now* dangerous under the statutory definition of that term. The statute is written in the present tense, and it has no qualifying language, such as that he must prove that he "is no longer dangerous" or that the circumstances that led to him being found dangerous in the past have changed. If the legislature intended that the individual be required to overcome the previous determination, it knows how to do so. *See, e.g.*, Ind. Code § 31-17-2-21 (criteria for modification of a child custody order includes a showing that "there is a substantial change" in the previously considered factors); Ind. Code § 31-16-8-1 (criteria for modification of a child support order includes a "showing of changed circumstances so substantial and continuing as to make the terms unreasonable"). But the legislature did not do so in the case. Therefore, contrary to the State's argument that Redington must prove he is no longer dangerous by rebutting the evidence that previously established he was dangerous with evidence that circumstances have changed, *see* Br. of Appellee at 11, the determination under section 8 is essentially a *new* determination in which the court must consider present circumstances and look prospectively when applying the definition of "dangerous." In other words, the trial court in 2012 made a determination *at that specific point in time*, but in 2018, the trial court should have made a determination based on the *instant timeframe* rather than incorporating its earlier decision. Likewise, we are not revisiting the 2012 determination but reviewing the facts and circumstances before the trial court in 2018.

[27]   As there has never been any evidence that Redington presents an imminent risk of personal injury to himself or others (section 35-47-14-1(a)(1)) or that he has a mental illness (section 35-47-14-1(a)(2)(A)), we evaluate whether he is dangerous solely under section 35-47-14-1(a)(2)(B): does the evidence show that *as of 2018* Redington may present a risk of personal injury to himself or another in the future *and* is he the subject of documented evidence that would give rise to a reasonable belief *in 2018* that he has a propensity for emotionally unstable conduct?

[28]   As to Redington's future risk, the State relies solely on the 2012 determination that Redington may present a risk of personal injury to himself or someone else in the future and argues the trial court was entitled to continue to credit Dr. Mayer's testimony from the first hearing over Dr. Wood's testimony from the more recent hearing.[9]  Under the State's formulation, a person could never prove they are not dangerous under section 35-47-14-8 because once a person has been deemed potentially dangerous in the future, "the future" becomes essentially endless and nothing that happens—or perhaps more relevantly, *does not happen*—after the original determination is relevant.  The State's constant refrain both in its brief and at oral argument was that "nothing has changed" from 2012; for instance, the State gives no credit to Redington's 2018 evidence

---

[9] The State focuses on Dr. Wood's disagreement with Dr. Mayer's 2012 opinion.  It is true that Dr. Wood did not believe there was a basis in 2012 to find Redington dangerous, but as we have stated, we are not revisiting the 2012 determination.  Importantly for our purposes, Dr. Wood testified that Redington does not *now* present a risk of future danger.

that he is still married to the same woman, still gainfully employed, and still has no criminal history despite those facts showing stability, because they are "facts that had been equally true in 2012[.]" Br. of Appellee at 16. But if the lack of aggressive or alarming behavior for several years is not a "change," then there is nothing Redington could ever show to prove he is not currently dangerous. And if, as the State posits, the earlier determination is entitled to at least equal weight with current evidence, then a person could never overcome the original determination because it will always be a consideration. If the State's position were correct, the statute would be unconstitutional as applied to Redington because the *Redington I* decision that the statute passed constitutional muster would have been based on the false promise that he could someday regain possession of his firearms. In short, the fact that we interpret the language in section 35-47-14-8 to require a new determination when a return of firearms is requested is what keeps the statutory scheme from being unconstitutional as applied, if not unconstitutional on its face.

[29] As Dr. Mayer said in 2012, "Everyone can be potentially dangerous." *Redington*, 992 N.E.2d at 844. Therefore, the crucial determination is whether Redington is the subject of documented evidence that would give rise to a reasonable belief in 2018 that he has a propensity for violent or emotionally unstable conduct. Dr. Wood testified that gauging a propensity for violent or emotionally unstable conduct "would have to be based on a set of behaviors or certain predictive factors." Tr., Vol. 2 at 48. The best evidence of the predictive factors for future risk in 2012 was the odd behavior Redington demonstrated in

Bloomington on two occasions and the testimony of Dr. Mayer that Redington had "a dangerous future potential." 992 N.E.2d at 844. The best evidence of the predictive factors for future risk *now* is what has happened between the original determination and the current proceeding. In this regard, we note that Redington could have asked for the return of his firearms after just six months. Ind. Code § 35-47-14-8(a). Instead, he did not file his petition until nearly three years after his firearms were confiscated and a hearing was not held for another two and one-half years. This is not a small sample size by which to gauge Redington's behavior—nearly six years have passed. And in those six years, the 2012 prediction has failed to come true: *nothing* has happened from which one could predict in 2018 that Redington is a risk now or in the future.

[30] We note two things about section 35-47-14-1(a)(2)(B): first, it requires documented evidence that an individual *has* a propensity for certain conduct. Like section 35-47-14-8, *see supra* ¶ 26, this section is written in the present tense and therefore requires current evidence of such a propensity. Second, to be found "dangerous," the statute requires a propensity for violent or emotionally unstable *conduct*. The statute does not hinge on thoughts or words. Dr. Wood testified that emotional instability "represents a person who has lost their capacity to cope with their external emotional experience and they start acting it out, verbally, physically." Tr., Vol. 2 at 48. Therefore, the State's reliance on, as Dr. Wood phrased it in his report, Redington's "interpersonal oddities," exhibit index, vol. 1 at 14, such as believing he has the gift of prophecy, is irrelevant absent evidence of him acting on those thoughts.

Redington met his burden of proving by a preponderance of the evidence that he is not dangerous by presenting the testimony of a psychiatrist that he does not present a risk in the future because there is no evidence he has a propensity for violent or emotionally unstable conduct. The burden of going forward then shifted to the State to show otherwise. *See Calumet Motor Sales of Hammond, Inc. v. M.F. Cooper Builders, Inc.*, 140 Ind. App. 624, 221 N.E.2d 438, 441 (1966) ("Once plaintiff-appellee introduced evidence to establish the essential elements of his cause of action, the burden of going forward shifted to the defendant-appellant to introduce evidence if, in its opinion, the evidence produced by plaintiff was not correct."). But the State offered no current evidence and elicited no testimony on cross-examination of Redington's witnesses that Redington currently has a propensity for emotionally unstable conduct. The undisputed evidence Redington offered in 2018 is that he currently has no propensity for violent or emotionally unstable conduct, which leads only to the conclusion that Redington is not currently dangerous; therefore, the trial court's judgment to the contrary is clearly erroneous. Redington is entitled to the return of his firearms.

# Conclusion

Because the State put on no evidence relevant to Redington's status at the time of his petition for return of his firearms and instead relied solely on evidence from 2012, the undisputed evidence and all reasonable inferences to be drawn from that evidence lead to but one conclusion—that Redington is not

dangerous—and therefore, the trial court's judgment to the contrary is clearly erroneous. We reverse the trial court's order and remand for the trial court to enter an order that Redington's firearms be returned to him.

[33] Reversed and remanded.

Riley, J., and Kirsch, J., concur.